UNITED STATES of America,
Plaintiff–Appellee,

v.

Melvin JOE, Defendant–Appellant.

No. 92–2213.

United States Court of Appeals,
Tenth Circuit.

Nov. 3, 1993.

Stephen P. McCue, Asst. Federal Public Defender, Albuquerque, NM, for defendant-appellant.

David Williams, Asst. U.S. Atty. (Don J. Svet, U.S. Atty., and Joe M. Romero, Jr., Asst. U.S. Atty., were on the brief), Albuquerque, NM, for plaintiff-appellee.

Before LOGAN, TACHA and KELLY, Circuit Judges.

TACHA, Circuit Judge.

Melvin Joe, a Native American living on the Navajo Indian Reservation in New Mexico, was convicted of one count of first degree murder (Count I) and one count of second degree murder (Count II) in violation of 18 U.S.C. §§ 1153 and 1111(a). Mr. Joe was sentenced to life imprisonment for Count I and a concurrent term of life imprisonment for Count II. Joe appeals his conviction and sentence. We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742 and affirm in part, reverse in part, and remand for resentencing on Count II.

## I. Background

### A. General Background

Melvin Joe and Julia Joe were married in November 1980. Ms. Joe filed a petition for divorce in August 1991 and the couple sepa-

rated. The Joes had four young children who continued to reside with Ms. Joe in Sanostee, New Mexico, a small, rural village located within the Navajo Indian Reservation.

On February 23, 1992, Melvin and his brother, Wallace Joe, drank beer continually throughout the morning and afternoon and Melvin passed out in Wallace's truck at approximately two o'clock. Sometime after six o'clock, Melvin drove a Chevrolet blazer belonging to his mother, Edith Joe, to his wife's residence. He knocked on the front door. When no one answered, he kicked open the door and entered the home brandishing an unloaded .22 caliber rifle. Melvin and Julia Joe fought and Melvin became physically abusive. Eventually, with the help of a neighbor, Matilda Washburn, Julia was able to get Melvin to leave the house.

Fearful that Melvin would return, Julia, Ms. Washburn, and one of the Joe children decided to leave the house and go to Ms. Washburn's home. As they exited, they noticed that Melvin had returned to the Blazer and was circling Julia's house. They stood next to the house for protection. The child, Jessica Joe, eventually ran to Ms. Washburn's house without interference. When Julia and Ms. Washburn tried to run, however, Melvin altered his circular pattern and drove straight at the fleeing Ms. Joe, striking her with the truck. Ms. Washburn went to the aid of the injured and screaming Julia Joe, helping her to the anticipated shelter of a nearby truck bed located in the field between the two houses. The truck bed, which had been completely removed from its frame, rested on four short wooden stumps.

Melvin apparently was undeterred by this new obstacle. He turned the Blazer in the direction of the truck bed, and, from a distance of approximately fifty feet, accelerated toward the truck bed, ramming the end of it opposite where the two women were standing. Upon impact, Melvin continued to accelerate, knocking the truck bed off the wooden stumps and pushing it over and onto Julia and Ms. Washburn. Still accelerating, Mel-

vin pushed the truck bed forward another fifty feet, running over the two women.

Julia Joe and Ms. Washburn both died of multiple internal and external injuries caused by blunt force. After kicking Julia's body several times, Melvin put it in the Blazer and drove to a hilly area three miles from the crime scene. Officers later recovered the abandoned Blazer with the keys in the ignition and Julia's body still inside. Two days later, on February 25, 1992, Melvin Joe turned himself in. Joe was indicted for two counts of first degree murder.

## B. Dr. Smoker's Testimony

At trial, defense counsel conceded that Melvin Joe had killed the two women. Mr. Joe's defense was that at the time of the killings he was intoxicated and enraged over the pending divorce, thus negating the requisite specific intent to sustain a conviction for first degree murder. With respect to Joe's intent, the government presented two types of evidence: the circumstances surrounding the murders and the testimony of Dr. Brett Smoker regarding statements made to him by Julia Joe. Dr. Smoker, an Indian Health Service family physician, testified that, eight days before Ms. Joe was killed, he treated her for an alleged rape and that she had identified her assailant as the defendant, Mr. Joe. (We will refer to Ms. Joe's comments regarding the alleged rape and her assailant as the "rape statement.") Dr. Smoker further testified that Ms. Joe stated she was "afraid sometimes" because Mr. Joe suspected her of having an extramarital affair and had threatened to kill her if he caught her with another man. (We will refer to Ms. Joe's comments regarding her fear and the basis for her fear as the "threat statement".)

The trial court admitted Dr. Smoker's testimony over defense counsel's timely objection, ruling on the evidence in two stages. The court first ruled that the threat and rape statements were admissible under the hearsay exception contained in Fed.R.Evid. 803(3)[1], rather than the Rule 803(4) excep-

---

1. Hearsay exception regarding statements about a then existing mental, emotional, or physical condition.

tion[2] proffered by the government. The court then responded to defense counsel's objections under Fed.R.Evid. 404(b)[3]. The court determined that the threat and rape statements were not precluded under Rule 404(b), as they were being offered to show Mr. Joe's "specific intent." The court also ruled that the relevance of the threat and rape statements was not outweighed by their prejudicial effect under Fed.R.Evid. 403.

After hearing the evidence, including the testimony of Dr. Smoker, the jury convicted Joe of first degree murder for killing his wife and second degree murder for killing Ms. Washburn.

## C. Grounds for This Appeal

On appeal, Joe asserts the following errors: (1) Dr. Smoker's testimony that Melvin had previously raped and threatened Ms. Joe was inadmissible hearsay evidence and prejudicial "other acts" evidence which violated his rights under the Sixth Amendment's Confrontation Clause; (2) Dr. Smoker's testimony of Joe's prior incarceration violated his due process rights under the Fifth Amendment; (3) the government's peremptory strike of the only Native American juror on the venire violated his right to equal protection under the Fourteenth Amendment; (4) the trial court's admission of photographs of the two victims violated his rights to due process and a fair trial; (5) the trial court's jury instruction on "malice aforethought" violated his rights to due process and a fair trial; (6) the trial court's determination that life imprisonment is the mandatory minimum sentence for first degree murder was improper under the United States Sentencing Guidelines; and (7) the trial court's imposition of a life sentence for second degree murder was improper under the Guidelines.

## II. Review of District Court's Rulings on Dr. Smoker's Testimony

Joe contends that Dr. Smoker's testimony contained inadmissible hearsay, "bad character" evidence barred by Rule 404(b),

and that the admission of the rape and threat statements violated his rights under the Confrontation Clause. We review the admission of evidence for an abuse of discretion. *United States v. Talamante*, 981 F.2d 1153, 1155 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1876, 123 L.Ed.2d 494 (1993). Further, "[w]e may affirm the rulings on admission of evidence if that evidence is admissible under any of the Federal Rules of Evidence; this court is not bound by the evidentiary basis relied upon by the trial court for the admission of the challenged evidence." *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1331 (10th Cir.1984); *see also United States v. Robinson*, 978 F.2d 1554, 1562 (10th Cir.1992). We review Joe's claim under the Confrontation Clause de novo. *See United States v. Ellzey*, 936 F.2d 492, 495 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 400; 116 L.Ed.2d 350 (1991).

## A. Rule 803(3)

We first address whether the district court properly admitted Dr. Smoker's testimony under Rule 803(3), which excepts from the hearsay rule "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Fed.R.Evid. 803(3). The court ruled that both the rape statement and the threat statement fell within the Rule 803(3) exception to the hearsay rule.

Rule 803(3) clearly sanctions the admission of a declarant's out-of-court statement concerning her then existing state of mind. *See United States v. Donley*, 878 F.2d 735, 737 (3d Cir.1989), *cert. denied*, 494 U.S. 1058, 110 S.Ct. 1528, 108 L.Ed.2d 767 (1990). With respect to the threat statement, Rule 803(3) therefore would extend to Ms. Joe's statement that she was "afraid sometimes." We disagree with the district court's ruling, however, because Ms. Joe's statement to Dr.

2. Hearsay exception regarding statements made for purposes of medical diagnosis or treatment.

3. Hearsay rule which directs that evidence of past crimes or other bad acts is generally inadmissible where offered to prove character in order to show action in conformity therewith.

Smoker, though indicating her state of mind, also included an assertion of *why* she was afraid (i.e., because she thought her husband might kill her). This portion of Ms. Joe's statement is clearly a "statement of memory or belief" expressly excluded by the Rule 803(3) exception. *See United States v. Rodriguez–Pando*, 841 F.2d 1014, 1019 (10th Cir. 1988). This situation is identical to that in *United States v. Cohen*, 631 F.2d 1223 (5th Cir.1980). In that case, a defendant charged with impersonating a federal officer contended that he lacked the requisite intent because he acted under duress. As evidence of duress, he sought to introduce out-of-court statements he had made relating alleged threats by Galkin, a co-conspirator. In admitting Cohen's out-of-court statement that he was scared but excluding the alleged basis for his fear under Rule 803(3), the Fifth Circuit explained:

> That rule by its own terms excepts from the ban on hearsay such statements as might have been made by Cohen of his then existing state of mind or emotion, but expressly excludes from the operation of the rule a statement of belief to prove the fact believed.... [T]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—"I'm scared"—and not belief—"I'm scared because Galkin threatened me."

*Id.* at 1225; *see also United States v. Liu*, 960 F.2d 449, 452 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 418, 121 L.Ed.2d 341 (1992); *United States v. Emmert*, 829 F.2d 805, 810 (9th Cir.1987) (quoting *Cohen* ).

▮▮ Here, Dr. Smoker testified that Ms. Joe said she was afraid of her husband be-cause he had threatened her. Ms. Joe's statement that she was afraid of her husband was admissible under Rule 803(3). The testimony relating Ms. Joe's belief underlying her fear, however, was not admissible under Rule 803(3).[4] Further, we see no grounds for admitting the rape statement under Rule 803(3).

### B. Alternative Grounds for Ruling on Dr. Smoker's Testimony

Because we may consider grounds for admission not relied on by the district court, *Fortier*, 747 F.2d at 1331, we also address the government's contention that the statements were admissible under Rule 803(4). The government argues that, because the rape and threat statements were made by Ms. Joe in the course of her treatment by Dr. Smoker, they are admissible under the exception to the hearsay rule contained in Fed.R.Evid. 803(4). Joe contends, however, that the statements were unrelated to diagnosis and treatment of her rape injuries and therefore not within the ambit of the Rule 803(4) exception. He also contends that they constitute inadmissible "other acts" evidence under Rule 404(b). We address separately the effect of Rules 803(4) and 404(b) on the rape and threat statements.

#### 1. The rape statement

##### a. Rule 803(4)

Rule 803(4) excepts from the hearsay bar "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Fed.R.Evid. 803(4). The Rule 803(4) exception to the hearsay rule is founded on a theory of reliability that emanates from the patient's own selfish motive—her understanding "that the effective-

---

**4.** We also reject the government's contention that Rule 803(3) applies here because the statement concerned an intended course of conduct. *See Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). Ms. Joe did not state *her* intent, but rather her husband's purported intent. Rule 803(3), however, applies only to a statement of the *declarant's* state of mind. *See United States v. Gomez*, 927 F.2d 1530, 1535–36 (11th Cir.1991). An out-of-court statement relating a third-party's state of mind falls outside the scope of the hearsay exception because such a statement necessarily is one of memory or belief.

ness of the treatment received will depend upon the accuracy of the information provided to the physician." 2 McCormick on Evidence § 277, at 246–47 (John W. Strong ed., 4th ed. 1992). The Supreme Court has noted that "statements made in the course of receiving medical care ... are made in contexts that provide substantial guarantees of their trustworthiness." *White v. Illinois,* — U.S. —, —, 112 S.Ct. 736, 742, 116 L.Ed.2d 848 (1992).

 While this guaranty of trustworthiness extends to statements of causation, it does not ordinarily extend to statements regarding fault. Fed.R.Evid. 803(4) advisory committee's note. Thus, a declarant's statement relating the *identity* of the person allegedly responsible for her injuries is not ordinarily admissible under Rule 803(4) because statements of identity are not normally thought necessary to promote effective treatment. *See United States v. Renville,* 779 F.2d 430, 436 (8th Cir.1985).

 Nevertheless, the Fourth, Eighth and Ninth Circuits have held that statements made by a child to a physician which identify the sexual abuser as a member of the family or household are "reasonably pertinent to diagnosis or treatment" and may therefore be admissible. *See United States v. Balfany,* 965 F.2d 575, 579 (8th Cir.1992) (citing *Ren-*

*ville,* 779 F.2d at 436); *United States v. George,* 960 F.2d 97, 99–100 (9th Cir.1992); *Morgan v. Foretich,* 846 F.2d 941, 949 (4th Cir.1988).[5] Statements revealing the identity of the child abuser are "reasonably pertinent" to treatment because the physician must be attentive to treating the child's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser. *Renville,* 779 F.2d at 437. Moreover, physicians often have an obligation under state law to prevent an abused child from being returned to an abusive environment. *Id.* at 438. As a result, where the abuser is a member of the family or household, the abuser's identity is especially pertinent to the physician's recommendation regarding an appropriate course of treatment, which may include removing the child from the home. *Id.*

 Unlike the victims in the cases cited above, Ms. Joe was not a child but rather the estranged wife of the alleged sexual abuser. However, the identity of the abuser is reasonably pertinent to treatment in virtually every domestic sexual assault case, even those not involving children. All victims of domestic sexual abuse suffer emotional and psychological injuries, the exact nature and extent of which depend on the identity of the abuser.[6] The physician generally must know

---

**5.** The Fourth, Eighth and Ninth Circuits agree that the crucial question in determining admissibility under Rule 803(4) is whether the statement is "reasonably pertinent to diagnosis or treatment." *George,* 960 F.2d at 99; *Morgan,* 846 F.2d at 949; *Renville,* 779 F.2d at 436. The Fourth and Eighth Circuits, however, have employed the following two-part test to determine a statement's admissibility under Rule 803(4): "first, the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." *Renville,* 779 F.2d at 436; *Morgan,* 846 F.2d at 949 (quoting *Renville*). This two-part test is not contemplated by the rule and is not necessary to ensure that the rule's purpose is carried out.

The first prong of this two-part test inquires into the declarant's motive. Such inquiries, however, were not contemplated by the rule; the rule itself has built-in guarantees that assure the trustworthiness of a statement made for purposes of medical diagnosis or treatment. *See White,* — U.S. at —, 112 S.Ct. at 742 (noting that

such statements "are made in contexts that provide substantial guarantees of their trustworthiness"). The second prong, which assures that the content of the statement (in these cases the identity of the abuser) is reasonably relied on by the physician in treatment or diagnosis, merely rephrases the Rule 803(4) requirement that the statement be "reasonably pertinent to diagnosis or treatment." In short, the plain language of Rule 803(4) should guide us in determining the admissibility of statements made for purposes of medical diagnosis or treatment.

**6.** In this case, Dr. Smoker testified as follows:

[The identity of the assailant is] extremely important in the sense that when we deal with victims of sexual assault, in terms of the way I look upon it, my care doesn't end at the end of my examination. I feel it's my duty to follow up that patient's care, make sure that they've gotten into appropriate counseling if necessary. Make sure that—if they are in a situation where this assault might occur again and again and again, that they do the best they can, draw up on [sic] as many resources within the com-

who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household. In the domestic sexual abuse case, for example, the treating physician may recommend special therapy or counseling and instruct the victim to remove herself from the dangerous environment by leaving the home and seeking shelter elsewhere. In short, the domestic sexual abuser's identity is admissible under Rule 803(4) where the abuser has such an intimate relationship with the victim that the abuser's identity becomes "reasonably pertinent" to the victim's proper treatment.

█ The facts of this case underscore the point. After performing a rape kit test on Ms. Joe, Dr. Smoker asked her several questions relating to her injuries. In answering these questions, Ms. Joe identified her husband, Melvin Joe, as her sexual abuser. Dr. Smoker testified that the identity of the sexual assailant was important for his recommendation regarding Ms. Joe's after-care, including appropriate counseling. Moreover, after discovering her assailant's identity, Dr. Smoker specifically recommended that Ms. Joe seek protection, offering her the number of the Navajo Police Department and referring her to the women's shelter in Shiprock, New Mexico. It is abundantly clear that the statement made by Ms. Joe revealing the identity of her alleged abuser was "reasonably pertinent" to her proper treatment by Dr. Smoker. Thus, we conclude that Dr. Smoker's testimony regarding Ms. Joe's rape statement, which identified Mr. Joe as her assailant, is admissible under Fed.R.Evid. 803(4).

### b. Rule 404(b)

█ Joe contends that, even if the rape statement is admissible under the hearsay rules, it is inadmissible "other acts" evidence under Fed.R.Evid. 404(b). Rule 404(b) is a special relevancy rule that deals with admission of evidence of a defendant's prior crimes or other bad acts. See Huddleston v. United States, 485 U.S. 681, 687, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771 (1988). We review the district court's determination that evidence is admissible under Rule 404(b) only for an abuse of discretion. United States v. Hamilton, 992 F.2d 1126, 1131 (10th Cir. 1993).

Rule 404(b) prohibits the admission of evidence of other bad acts offered only for the purpose of adversely reflecting on the actor's character, but permits such evidence for other purposes, such as demonstrating intent.[7] Four general requirements emanating from Rule 404(b) and other relevancy rules must be met before evidence of prior acts will be admissible: (1) the evidence must be offered for a proper purpose under Rule 404(b); (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination that the probative value of the similar acts evidence is not substantially outweighed by its potential for unfair prejudice; and (4) under Rule 105, the trial court must, upon request, instruct the jury that the evidence of similar acts is to be considered only for the proper purpose for which it was admitted. United States v. Jefferson, 925 F.2d 1242, 1258 (10th Cir.1991); see Huddleston, 485 U.S. at 691–92, 108 S.Ct. at 1502. On appeal, Joe contends that the government failed to satisfy all four requirements. We disagree.

First, the government clearly offered Dr. Smoker's testimony for a proper purpose. The government filed a Notice of Intention to Offer Proof, stating that it intended to introduce proof of Mr. Joe's alleged sexual assault against Ms. Joe as evidence of his motive, specific intent, plan, and absence of mistake or accident. The defendant argues that the government and the trial court failed to articulate precisely the purpose for which the rape statement was offered as is generally required under United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir.1985), cert. denied,

---

munity as possible to remove themselves from that dangerous situation.

7. Rule 404(b) provides in relevant part:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). In *United States v. Record,* 873 F.2d 1363, 1375 n. 7 (10th Cir.1989), however, we held that even if the basis for admission has not been specifically articulated, the error is harmless as long as a proper purpose is apparent from the record. Based on the record, it is evident that the proper purpose for admitting the rape statement was to prove the defendant's intent to commit acts of violence against his wife. Therefore, we conclude that the failure to adhere to the *Kendall* specificity requirements was harmless and that Dr. Smoker's testimony regarding the rape statement satisfies the first prong of the four-part admissibility test.

Second, the rape statement was relevant because Mr. Joe's act of sexual violence is highly probative of his intent to commit acts of violence against Ms. Joe. *See United States v. Russell,* 971 F.2d 1098, 1107 (4th Cir.1992) (holding that evidence of husband's prior acts of abuse against his wife was probative of his motive and intent to kill her), *cert. denied,* —— U.S. ——, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993); *Virgin Islands v. Harris,* 938 F.2d 401, 420 (3d Cir.1991) (holding that evidence of husband's history of violence toward his wife, including his attempts to strangle and stab her, were highly probative in demonstrating his motive and intent).

■■■ Third, the trial court specifically made a Rule 403 determination that the probative value of the rape statement was not substantially outweighed by its potential for unfair prejudice. "The trial court has broad discretion to determine whether or not prejudice inherent in otherwise relevant evidence outweighs its probative value." *Jefferson,*

925 F.2d at 1258 (quoting *Record,* 873 F.2d at 1375). We cannot say that the trial court abused its discretion here.

Fourth, upon the defendant's request, the district court instructed the jury that the evidence of Mr. Joe's alleged rape of Ms. Joe was to be considered only for very limited purposes.[8] The defendant argues that the limiting instruction was improper because it contained a "laundry list" of the possible Rule 404(b) uses which confused the jury and encouraged them to convict Mr. Joe on the basis of his criminal propensities. We disagree.

Although a limiting instruction containing a "laundry list" of permitted uses of Rule 404(b) evidence is disfavored, *see United States v. Doran,* 882 F.2d 1511, 1525 (10th Cir.1989) (stating that "merely 'laundry list[ing]' " the text of the rule to the jury is "not the best way to proceed in such matters"); *see also United States v. Cortijo–Diaz,* 875 F.2d 13, 15–16 (1st Cir.1989), we have never held that such an instruction is improper per se. Moreover, the limiting instruction in this case did not merely recite a "laundry list" of the permitted uses of Rule 404(b) evidence; it was carefully worded to ensure that the jury would understand the proper purposes for which the prior act evidence could be used. In addition, the court gave the limiting instruction both at the time the evidence was admitted and at the end of the case, instructing the jury not to "consider any of this evidence in deciding if the defendant committed the acts charged in the indictment." We conclude that the instruction was adequate. Thus, the rape statement is admissible under Rule 404(b) because all four requirements were met.

---

8. The instruction read:

You have heard just now through Doctor Smoker evidence of another alleged wrongful act of the defendant. You must not consider any of this evidence in deciding if the defendant committed the acts charged in the indictment. However, you may consider this evidence for other very limited purposes. If you find beyond a reasonable doubt from other evidence in this case that the defendant did commit the acts charged in the indictment, then you may consider evidence of this other wrongful act committed on another occasion to determine whether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment, or whether the defendant had a motive or the opportunity to commit the acts charged in the indictment, or whether the defendant acted according to a plan or in preparation for the commission of a crime, or whether the defendant committed the acts for which he is on trial by accident or mistake.

*c. The Confrontation Clause*

■ Joe finally asserts that the admission of the rape statement was improper because it violated his rights under the Confrontation Clause. The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. The Supreme Court has "consistently held that the Clause does not necessarily prohibit the admission of hearsay statements against a criminal defendant, even though the admission of such statements might be thought to violate the literal terms of the Clause." *Idaho v. Wright,* 497 U.S. 805, 813, 110 S.Ct. 3139, 3145, 111 L.Ed.2d 638 (1990). However, the clause does "bar[ ] the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Wright,* 497 U.S. at 814, 110 S.Ct. at 3146.

The Supreme Court has determined that a statement admissible under an exception to the hearsay rule does not violate the Confrontation Clause if the statement "bears adequate 'indicia of reliability' ". *Id.* (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). The "indicia of reliability" requirement may be satisfied in two ways. Reliability is assumed if the evidence is admitted under a "firmly rooted hearsay exception." *Id.,* 497 U.S. at 815, 110 S.Ct. at 3146. Otherwise, reliability is established if the evidence is supported by "particularized guarantees of trustworthiness." *Id.*

Federal Rule of Evidence 803(4), the exception to the hearsay rule for statements made for purposes of medical diagnosis or treatment, is undoubtedly a firmly rooted hearsay exception. *See White v. Illinois,* — U.S. —, — n. 8, 112 S.Ct. 736, 742 n. 8, 116 L.Ed.2d 848 (1992); *see also Wright,* 497 U.S. at 820, 110 S.Ct. at 3149. Because the rape statement made by Ms. Joe to Dr. Smoker falls under the firmly rooted Rule 803(4) hearsay exception, the statement possesses the requisite "indicia of reliability." Therefore, Joe's Confrontation Clause rights were not violated by the admission of the rape statement.

*2. The threat statement*

■ The government asserts that the threat statement also is admissible under the exception to the hearsay rule contained in Rule 803(4). We disagree. Ms. Joe told Dr. Smoker that she was "afraid sometimes" because her husband had threatened to kill her if he ever caught her with another man. This statement is inadmissible under Rule 803(4) because it fails to satisfy the rule's requirements—the statement does not describe medical history, symptoms, pain, sensations, or the inception or general character of the cause of the alleged rape injury for which Ms. Joe was being treated. *See* Fed. R.Evid. 803(4). Because the threat statement does not fall under any other hearsay exception, we conclude that the district court erred in admitting it over the defendant's objection.

■ This does not end our analysis, however, because we must determine whether the erroneous admission of the threat statement was harmless. Because Joe contends that the admission of the threat statement violated his rights under the Confrontation Clause, we apply the constitutional harmless error standard of review. A constitutional error may be deemed harmless only if it was "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ Based on our careful review of the record, we conclude that the error in admitting the threat statement was harmless beyond a reasonable doubt. In addition to the threat statement, the record is replete with evidence from which the jury could infer Joe's intent to commit the murders. Moreover, the prosecution did not focus on the threat, referring to it only one time in the rebuttal portion of his closing argument. In this larger context, we find that the erroneous admission of the threat statement was harmless even under the constitutional harmless error standard.

**C. Prior Incarceration**

■ In response to questioning by the prosecutor, Dr. Smoker referred to Mr. Joe's

prior incarceration.[9] Defense counsel immediately objected to such testimony and, after cross-examining Dr. Smoker, moved for a mistrial. Joe asserts that the district court's failure to grant his motion for a mistrial deprived him of his right to due process and a fair trial. We review the district court's denial of Joe's motion for a mistrial for an abuse of discretion. *United States v. Peveto*, 881 F.2d 844, 859 (10th Cir.), *cert. denied*, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989).

■ In *United States v. Sands*, 899 F.2d 912 (10th Cir.1990), we held that a new trial is warranted where it cannot be said "with reasonable certainty that the reference to [the prior incarceration] 'had but very slight effect on the verdict of the jury.'" *Sands*, 899 F.2d at 916 (quoting *Sumrall v. United States*, 360 F.2d 311, 314 (10th Cir.1966)). Here, Dr. Smoker's reference to Joe's prior incarceration was a single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction. Based on these factors, we conclude that the reference to Joe's prior incarceration "had but very slight effect on the verdict of the jury," *Sumrall*, 360 F.2d at 314, and that the district court therefore did not abuse its discretion in denying Joe's motion for a mistrial.

### III. Peremptory Challenge to Juror

The defendant asserts that he was denied equal protection of the law as a result of the prosecutor's peremptory challenge of Dawn Ferguson, the only Native American juror on the venire. "This court reviews a challenge

to the improper striking of prospective jurors based on their race de novo, giving deference to the trial court's first-hand observation of the circumstances of each case." *United States v. Hartsfield*, 976 F.2d 1349, 1355–56 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1344, 122 L.Ed.2d 727 (1993).

■ To successfully challenge the government's peremptory strike of Dawn Ferguson, the defendant must first establish a prima facie case of purposeful discrimination:

(1) the defendant must show that he is a member of a cognizable racial group, and that the prosecution has exercised peremptory challenges to remove members of a particular race from the venire; (2) the defendant is entitled to rely on the fact that peremptory challenges are a jury selection practice which permits discrimination by those who wish to discriminate; and (3) the defendant must show that these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire members from the petit jury on account of their race.

*United States v. Esparsen*, 930 F.2d 1461, 1465 (10th Cir.1991) (citing *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986)), *cert. denied*, —— U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation" for the peremptory challenge. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723. After receiving the state's explanation, the trial court must then

---

9. Dr. Smoker's reference to Joe's prior incarceration occurred in the following context:

> Prosecutor: What concerns did she express to you with reference to her husband during the history that you were getting from her?
> Dr. Smoker: May I explain the context of the information I got?
> Prosecutor: Sure.
> Dr. Smoker: After examining a sexual assault patient who has allegedly been sexually assaulted, as I say, I try to establish the—well, the likelihood of this happening again and if the patient is in a dangerous situation. And I asked her toward the end of our examination, do you feel that this might happen again or do you feel that you're in a situation where you might be in danger?

> And she responded, well, yes. And she said, I'm afraid sometimes he might kill me. And I said, my gosh, why is that? And she told me that her husband had suspected her of having extra-marital affairs or that she had a boyfriend, especially *when he had recently been in jail* [emphasis added]. And she said that on—
> Defense counsel: Objection, Your Honor. May we approach the Bench?
> The Court: No, sir. Ladies and gentlemen, you'll ignore that last comment about—other than what the doctor's testified—do not relate any of the defendant's history, please, Doctor Smoker.

"determine if the defendant has established purposeful discrimination." *Id.* at 98, 106 S.Ct. at 1724.

We conclude that the defendant established a prima facie case of purposeful discrimination because Joe is a member of a cognizable racial group, Native Americans, and the prosecutor's use of one peremptory challenge to strike Dawn Ferguson, the only Native American juror on the venire, raised an inference that Dawn Ferguson was excluded on account of her race. *See United States v. Chalan,* 812 F.2d 1302, 1313–14 (10th Cir.1987) (holding that the government's peremptory strike of the last potential American Indian juror created a prima facie case of discrimination). The prosecutor, however, offered three legitimate race-neutral reasons for this peremptory challenge: Ms. Ferguson was an artist; she was only twenty-five years of age; and she failed to respond on a questionnaire whether she owned or rented a home. The prosecutor believed that artists tended not to be pro-government, and given the serious nature of a murder charge, the prosecutor was understandably concerned about the jurors' life experiences and maturity level. Based on these proffered reasons, the trial court ruled that the peremptory challenge of Dawn Ferguson was not based on race. Giving deference to the trial court's first-hand observation of these circumstances, we find insufficient evidence of purposeful discrimination and affirm the trial court's allowance of the prosecutor's peremptory challenge.

## IV. Victim Photographs

The defendant asserts that the trial court's admission of identification photographs of the two victims violated his rights to due process and a fair trial. "We review the admission of photographs only for an abuse of discretion." *United States v. Sides,* 944 F.2d 1554, 1562 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 604, 116 L.Ed.2d 627 (1991). " 'The trial judge's exercise of discretion in balancing the prejudicial effect and probative value of photographic evidence of this type is rarely disturbed,' "

*United States v. Soundingsides,* 820 F.2d 1232, 1243 (10th Cir.1987) (quoting *United States v. Goseyun,* 789 F.2d 1386, 1387 (9th Cir.1986)), and we will not disturb it in this case.

The government alleged that the defendant murdered Ms. Joe and Ms. Washburn and therefore had the burden of proving the identity of these two victims. To prove the identity of the victims, the government introduced photographs of Ms. Joe and Ms. Washburn that had been taken prior to their deaths. Defense counsel objected to the admission of these photographs, arguing that the identity of the victims was not at issue and that the photographs were prejudicial. We reject these arguments.

The defendant never stipulated to the identity of the victims. Thus, the government was not relieved of its burden to prove identity and the photographs are probative of the victims' identity. *See United States v. De Parias,* 805 F.2d 1447, 1453 (11th Cir. 1986) (making the unsurprising point that "[p]hotographs of homicide victims are relevant in showing the identity of the victim"), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). More importantly, we are convinced that the photographs were not unfairly prejudicial. " 'Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter....' " *Sides,* 944 F.2d at 1563 (citations omitted). We held in *Sides* that close-up photographs revealing the victim's wounds and bloodstained shirt were probative and not unfairly prejudicial to the defendant. *Id.* Similarly, in *United States v. Naranjo,* 710 F.2d 1465, 1468–69 (10th Cir. 1983), we held that the probative value of a photograph depicting a great deal of blood on a pillow, bedsheets, and the victim's face was not outweighed by its potential for prejudice. Unlike the graphic photographs in *Sides* and *Naranjo,* the photographs in this case merely showed the victims' faces prior to injury.[10] The district court did not abuse its discretion in admitting the identification photographs.

---

10. We also note that the trial judge was careful not to admit any photographs depicting the gruesome injuries inflicted upon Ms. Joe and Ms. Washburn.

## V. Jury Instructions

The defendant next asserts that the district court's instructions to the jury were improper. When examining a challenge to jury instructions, "we examine [the instructions] as a whole and apply a de novo standard of review to determine the propriety of tendering an individual jury instruction." *United States v. Sasser*, 974 F.2d 1544, 1551 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1063, 122 L.Ed.2d 368 (1993). Thus, we "consider all that the jury heard and, from [the] standpoint of the jury, decide 'not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine these issues.'" *United States v. Cardall*, 885 F.2d 656, 673 (10th Cir.1989) (quoting *Durflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir.1984)).

The district court instructed the jury that, "To kill with malice aforethought means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life." Joe contends that the district court erred in submitting this instruction because it authorized the jury to infer malice based on a callous and wanton disregard for human life. According to Joe, the "callous and wanton disregard for human life" instruction relieved the prosecution of its burden to prove specific intent because the jury was permitted to find "malice aforethought" based solely on Joe's actions.

■ We have previously noted that "[m]alice aforethought may be established by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm." *Soundingsides*, 820 F.2d at 1237; *see also Montoya v. United States Parole Comm'n*, 908 F.2d 635, 641 (10th Cir.1990) (Tacha, J., dissenting) (stating that "malice aforethought" may be based on one's callous and wanton disregard for human life); *United States v. Chagra*, 807 F.2d 398, 402 (5th Cir.1986), *cert. denied*, 484 U.S. 832, 108 S.Ct. 106, 98 L.Ed.2d 66 (1987). Based on *Soundingsides*, we conclude that

Joe's malice aforethought may be established by his "callous and wanton disregard" for the lives of Ms. Joe and Ms. Washburn. The trial court's instruction on this point was proper.

■ Joe also argues that, taken as a whole, the jury instructions were "hopelessly undecipherable" and that they prevented the jury from properly distinguishing between the elements of first and second degree murder and manslaughter. In the instructions, the court first gave the jury a list of the distinct elements required to convict the defendant of first degree murder, the crime charged in the indictment, and then outlined the specific elements of second degree murder and voluntary manslaughter. Further, the court instructed the jurors that they must acquit the defendant if they were not convinced beyond a reasonable doubt of the defendant's guilt of first degree murder, second degree murder or voluntary manslaughter. The court also gave carefully worded pattern instructions defining the key terms "unlawfully," "willfully," "malice aforethought," "premeditation," and "specific intent." The court emphasized that proof of specific intent was required to convict the defendant of first degree murder but not second degree murder or voluntary manslaughter. After carefully reviewing the record and examining the jury instructions as a whole, we believe that the instructions accurately stated the governing law so that the jury understood its duties and was not misled in any way. Accordingly, we conclude that the instructions submitted to the jury were not improper.

## VI. Sentencing

■ Joe finally contends that the district court committed two separate sentencing errors. The validity of a sentence imposed under the Sentencing Guidelines is a question of statutory interpretation which we review de novo. *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir.1986).

### A. Count I

■ The district court sentenced Joe to life imprisonment after the jury convicted

him of first degree murder on Count I. Joe asserts that the trial court erred in concluding that life imprisonment is the mandatory minimum sentence for first degree murder under 18 U.S.C. § 1811. In *United States v. Sands*, 968 F.2d 1058, 1066 (10th Cir.1992), we held that the statutory language of 18 U.S.C. § 1111 requires that a defendant convicted of first degree murder serve a minimum sentence of life imprisonment. We find *Sands* dispositive and conclude that the district court did not err here.

### B. Count II

The defendant also alleges that the district court erred by imposing a life sentence for his conviction of second degree murder on Count II. The government concedes that the life sentence imposed on Count II is inconsistent with the applicable sentencing guidelines contained in §§ 2A1.2 and 3D1.4(c). We therefore reverse the sentence of life imprisonment for Count II and remand for the limited purpose of resentencing on this count.

### VII. Conclusion

We **AFFIRM** Joe's conviction and sentence on Count I. We **AFFIRM** Joe's conviction on Count II. We **REVERSE** the district court's sentencing decision on Count II and **REMAND** for the limited purpose of resentencing on Count II.