NE`EMIA NIUPULUSU, Defendant/Appellant,

v.

AMERICAN SAMOA GOVERNMENT, Appellee.

High Court of American Samoa
Appellate Division

AP No. 02-02

June 28, 2004

Before RICHMOND, Associate Justice, GOODWIN,[*] Acting Associate Justice, TASHIMA,[**] Acting Associate Justice, LOGOAI, Chief Associate Judge, and TAPOPO, Associate Judge.

Counsel: For Appellant, Bentley C. Adams, III, Assistant Public Defender
For Appellee, Frederick J. O'Brien, Assistant Attorney General

## OPINION AND ORDER

Defendant Ne'emia Niupulusu was convicted by a jury of inappropriately touching his daughter, and he appeals. He challenges three rulings by the Trial Division: (1) the denial of a court ordered mental examination of the defendant; (2) the admission of testimony under a hearsay exception; and (3) the denial of a motion to dismiss each count of the indictment for lack of sufficient evidence.

## **Background**

On March 19, 2001, Defendant's wife, Tofoi Niupulusu ("Tofoi"), reported to police that Defendant had molested their ten-year old daughter ("victim" or "daughter"). (Trial Tr. at 54.) Defendant was arrested the next day (Resp. to Def.'s Mot. for New Trial at 2), and charged with three counts of Child Molestation and three counts of Incest for conduct occurring on or about January 1, 2001, sometime during the month of February 2001, and March 2, 2001. (Trial Tr. at 5-7.)

Before trial, defense counsel filed a motion requesting "a mental examination of the appellant by a psychiatrist or other person medically or otherwise qualified to give an opinion of the appellant's mental condition to determine whether the appellant is mentally competent to stand trial and whether the appellant was sane at the time of the commission of the criminal acts charged in the . . . information." (Appellant's Br. at 4.) In support, defense counsel argued at a hearing on the motion that the victim had told him that defendant had exhibited bizarre behavior such as walking around, yelling and screaming. (Arraignment Transcript ("Arr. Tr.") at 4.) Defense counsel also argued

---

[*] Honorable Alfred T. Goodwin, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, serving by designation of the Secretary of Interior.
[**] Honorable A. Wallace Tashima, Circuit Judge, United States Court of Appeals for the Ninth Circuit, serving by designation of the Secretary of Interior.

that Defendant currently receives Social Security benefits because of his mental condition. (Arr. Tr. at 3-4.) Defense counsel acknowledged that defendant had been found competent to stand trial by a psychiatric nurse, Maelega Amani, R.N., whom the government claims was the only mental health care professional at the LBJ Hospital following the retirement of Dr. Malaefou Elisaia. (Resp. to Def.'s Mot. for New Trial at 2.) The Trial Division denied the motion, ruling that Defendant did not show he was unable to assist in his defense. *Niupulusu v. American Samoa Gov't,* CR No. 19-01, Order denying Motion for Mental Examination at 3 (Trial Div.).

Defendant also filed a pretrial motion in limine to exclude testimony of Dr. Ianeta Timoteo, an OB/GYN resident who had examined the child at the behest of police, that the child had identified her father as the perpetrator. (Trial Tr. at 16.) The motion alleged that the testimony did not fit the hearsay exception for statements made to a physician because the identity of the perpetrator was not relevant for diagnosis or treatment. (*Id.* at 17.) The Trial Division denied the motion. (*Id.*)

At trial, the government called four witnesses: the victim; Tofoi; Defendant's son Ne'emia Sonny Niupulusu Jr. ("Sonny"); and Dr. Timoteo. Defendant's daughter testified that on the afternoon of January 1, 2001, while she watched television with her brother, Defendant fondled her vagina. (Trial Tr. at 35.) Later that night, while she, her siblings and her mother slept in an adjacent house on the property, she said that Defendant touched the inside of her vagina with his hand. (*Id.* at 36, 47.) She also testified that Defendant had touched her in February (*Id.* at 37), and that she told her mother about the touching in mid-March, when her mother had asked her to report if "someone does a bad thing to [her]." (*Id.* at 38.) She also said that after Defendant's arrest he spoke to her twice about her upcoming testimony, saying "to come and say this is all a lie." (*Id.* at 49.) On cross-examination, however, she testified that they had slept in the adjacent house, rather than the main house, because "[defendant] and my mother argued when he was asked why he did this to me." (*Id.* at 48.)

Tofoi said that she asked her daughter about any improper touching after overhearing Defendant talk about "Noah and Abraham" and say "it's best for the father to go to his own daughter instead of a different person because he would shoot that person." (Trial Tr. at 52-53.) After Tofoi took her to the police station, police officers took the child to the hospital. (*Id.* at 54.) Tofoi testified to being unemployed, but supported by Defendant's and the children's Social Security checks. (*Id.* at 59.) She also stated that she and the children left Defendant "[m]any times. I would say over 20 times." (*Id.* at 60.) While visiting Defendant at the jail, Tofoi said that she had heard Defendant tell the victim to say it was all a lie. (*Id.* at 57.)

Sonny testified to overhearing Defendant mutter to himself that "it's better that he was going to his own daughter than other men doing it to his own daughter" (Trial Tr. at 65), and to hearing him tell his daughter to say that it was a lie (*Id.* at 68).

Dr. Timoteo testified that she found no lacerations or bruising of the genitalia, but was unable to feel the child's hymen. (*Id.* at 24-25.) Regarding the importance of the perpetrator's identity, the prosecutor engaged in the following exchange with Dr. Timoteo:

Q: Now when you're confronted with a situation where a child alleges that someone is responsible for his or her condition, is the identity of that person relevant to your diagnosis and treatment decisions?
A: Yes, it is.
Q: And why is that, doctor?
A: Because sometimes we have to record that in the record. Everything that's told by the patient has to be recorded.
Q: In a case where sexual abuse is alleged, do you have any duties that come about with such allegations?
A: It is my duty to get the story from the patient and then look for any sign to corroborate this story that the patient has told.
Q: And is it - when you're dealing with a child, is the child's emotional condition relevant to your treatment decision?
A: Yes, it is.
Q: And in a case where after examination you conclude that a child has been sexually abused, do you have a duty to report it to anyone?
A: Yes.

(Trial Tr. at 22.) Dr. Timoteo then testified that the child had said that her father had been fondling her private parts since New Year's Day by inserting his fingers in her vagina. (*Id.* at 26.) Dr. Timoteo opined that her inability to feel the victim's hymen would be consistent with her account of her father's actions. (*Id.*)

When the government rested, Defendant moved for a dismissal of the charges for want of sufficient evidence, citing inconsistencies in the testimony of the child regarding counts one and two (relating to the January 1 conduct), her unspecific testimony regarding counts three and four (relating to the February conduct), and no testimony regarding counts five and six (relating to the March 2 conduct). (*Id.* at 69.) The prosecutor agreed that counts five and six had not been established, and the court granted the motion only as to those counts. (*Id.* at 70.)

The defense then presented the testimony of Niuapapa Taulapapa and Defendant. Taulapapa testified that he and Defendant had been together

71

drinking Samoan Kava until five or six in the morning on New Year's Day. (Trial Tr. at 72.) Defendant testified that he never improperly touched his daughter or said that it was better for a father to go to his own daughter. (*Id.* at 84.) He explained that he had asked her about her testimony at the jail, but that she had said that she would say it was not true. (*Id.*) On cross-examination, Defendant did admit that he had referred to Abraham and Noah, explaining that when Tofoi asked if he "look[s] with desire . . . towards [his] children" he "sat there and suddenly I spurted this out. Abraham did this to his children." (*Id.* at 88-89.)

The jury convicted Defendant on one count of Child Molestation and one count of Incest for his actions on January 1, as well as one count of each offense for his actions in February. (*Id.* at 112.) On October 24, 2001, he was sentenced to thirty years in prison on each count of Child Molestation and five years in prison on each count of Incest, with the sentences to run concurrently. *Niupulusu,* CR No. 19-01, Judgment and Sentence at 2 (Trial Div.).

## Discussion

### I. Motion for Mental Examination

Defendant argues that the Trial Division erred in denying his motion for a mental examination. Counsel sought a psychiatric examination for two reasons: (1) to determine whether Defendant was fit to stand trial and assist in the defense; and (2) to discover a possible defense of lack of criminal intent, from lack of ability to form an intent. He concedes that "admittedly there was little evidence of [Defendant's] lack of competency at the time of trial," but argues that there was considerable evidence that he suffered from a mental disability at the time of the crimes. (Appellant's Br. at 5.) He cites his receipt of Social Security benefits for a mental disability, his trial testimony that Abraham and Noah had done it to their children and the victim's statements to defense counsel that Defendant had acted bizarrely. The government has not filed an appellate brief, but contested Defendant's motion for a new trial, which raised the same issue. There, the government argued that Defendant had been found to be fit for trial, that Defendant waived the defense of diminished capacity and that the Trial Division was within its discretion in denying the motion. (Resp. to Def.'s Mot. for New Trial at 4.)

The Trial Division's ruling that Defendant was competent to stand trial is reviewed for clear error, *United States v. Gastelum-Almeida,* 298 F.3d 1167, 1171 (9th Cir. 2002), and its denial of a motion for a mental examination is reviewed for an abuse of discretion. *United States v. George,* 85 F.3d 1433, 1437 (9th Cir. 1996).

■ A.S.C.A. § 46.1303 provides: "The court may order a mental examination of a defendant upon motion of the defendant or the government, or upon the court's own motion, at any time before judgment." A.S.C.A. § 46.1304(b) states: "Unless otherwise specified by the court, the scope of the examination pertains to whether: (1) the defendant is mentally competent to stand trial; and (2) the defendant was sane at the time of the commission of the criminal act charged." Under American Samoa law, persons are presumed to be sane and mentally competent. A.S.C.A. § 46.1306(a).

The U.S. Supreme Court has stated that the trial court must conduct an evidentiary hearing only where the evidence raises a "bona fide doubt" that the defendant is not competent to stand trial. *Pate v. Robinson,* 383 U.S. 375, 385 (1966). The defendant bears the burden of producing "substantial evidence" of his mental incompetency. *Davis v. Woodford,* 333 F.3d 982, 997 (9th Cir. 2003) (citation omitted).

Here, at the government's request, Defendant was examined by Nurse Amani, whose testimony the Trial Division elected to consider pursuant to A.S.C.A. § 46.1306(b).[1] Nurse Amani concluded that he was competent to stand trial, understood the charges against him, and could assist in his defense. (Amani's Mental Status Report at 2.) Defendant presented no evidence to refute this finding, and admits on appeal that there is "little evidence" that he could not assist in his defense. Thus, the Trial Division did not clearly err in determining that Defendant was fit to stand trial.

Defendant also did not carry his burden of demonstrating that a mental examination was necessary. His receipt of Social Security benefits on account of a mental disability and counsel's statement that the victim had observed Defendant acting oddly are not sufficient, standing alone, to demonstrate that the Trial Division abused its discretion in not ordering a mental examination. Nurse Amani concluded that Defendant understood the illegality of the charged conduct, and that "[h]e has denied the charges, claiming he cares about his daughter and would not do any such actions." (*Id.*) Therefore, the Trial Division did not abuse its discretion in denying the motion for a mental examination.

It must be noted that, contrary to Defendant's argument on appeal, the adverse ruling on the motion for a mental examination did not foreclose a

---

[1] A.S.C.A. § 46.1306(b) states, in full:
In the sound discretion of the court, any evidence may be received relative to the defendant's mental competence or sanity at any proceeding to determine that competence or sanity. Within this framework, traditional rules of evidence affect the weight, but not the admissibility, of evidence.

defense of diminished capacity. Defendant could have advised the government of his intent to present a defense of insanity consistent with T.C.R.Cr.P. 12.2(a) or (b), then requested a bifurcated trial. *See Am. Samoa Gov't v. Taylor*, 19 A.S.R.2d 99 (Tr. Div. 1991). Whether Defendant committed the crimes alleged would have been determined in the first phase, and, if he were found guilty, a second phase would have occurred in which he could have presented evidence of his insanity or diminished capacity. *Id.* at 103-04.

## II. Hearsay

Defendant contends that the government did not show that his identity was necessary to Dr. Timoteo's diagnosis or treatment. Defendant argues that it is significant that police officers took the victim to Dr. Timoteo to obtain evidence, and that the error was not harmless because it unduly bolstered the victim's testimony. In its response to Defendant's motion for a new trial, the government asserted that the testimony was necessary for treatment, that the importance of the statements for law enforcement purposes does not render them inadmissible, and that the probative value outweighed any prejudicial effect.

■ Evidentiary rulings are reviewed for an abuse of discretion. *Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997). Even where the ruling was incorrect, the conviction will not be reversed "unless a substantial right of the party is affected[.]" T.C.R.Ev. 103(a).

■ Hearsay is an out-of-court statement offered for the truth of the matter asserted. T.C.R.Ev. 801(c). However, a statement is not hearsay where "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." T.C.R.Ev. 803(4). Although generally the identity of the perpetrator does not fit within the hearsay exception, "a child victim's statements about the identity of the perpetrator are admissible under the medical treatment exception *when they are made for the purposes of medical diagnosis and treatment.*" *Guam v. Ignacio*, 10 F.3d 608, 613 (9th Cir. 1993) (emphasis in original); *see also George*, 960 F.2d at 99 (admissible where "reasonably pertinent to diagnosis or treatment"). Because sexual abuse can inflict psychological and emotion injuries, as well as physical injury, the course of treatment may be dictated by whether the perpetrator is a relative of the victim. *George*, 960 F.2d at 99.

The doctor's testimony was hearsay because it was offered to prove the truth of the statement, namely that Defendant committed the acts alleged. It was also a legitimate part of the medical history the doctor said she was required professionally and legally to ascertain in cases where a

child is examined in connection with a molestation investigation. The legitimacy of the taking of the medical history, however, does not answer the question of how much of what the doctor heard can be retailed to the jury.

Dr. Timoteo testified that the identity of the responsible party is relevant to the diagnosis and treatment "[b]ecause sometimes we have to record that in the record." (Trial Tr. at 22.) Where sexual abuse is involved, she explained that she has a duty to determine whether the patient's explanation of the injury can be corroborated, and, if she finds evidence of sexual abuse, to report it to the authorities. (*Id.* at 22.) Absent from Dr. Timoteo's testimony is an explanation of how the identity of the abuser was "reasonably pertinent" to the diagnosis or treatment. *See* T.C.R.Ev. 803(4); *see also George*, 960 F.2d at 99. It is not sufficient that Dr. Timoteo had an obligation to record or report the perpetrator's identity, or to corroborate the victim's account of what had occurred, because those purposes do not relate to the course of treatment or diagnosis. Without connecting Defendant's identity to the course of treatment or diagnosis, the statement should not have been admitted under the hearsay exception.

*United States v. Joe*, 8 F.3d 1488, 1495 (10th Cir. 1993), which the government cites in its response to Defendant's motion for new trial, does not dictate a different result. There, unlike here, the physician testified that the identity of the sexual assailant influenced his recommendation of the victim's after-care and counseling. *Joe*, 8 F.3d at 1495. The physician also said that it led him to give her the telephone number of the police department and refer her to a women's shelter. *Id.*

Although inadmissible hearsay, Dr. Timoteo's recitation of the victim's statements did not affect a substantial right of defendant's. *See* T.C.R.Ev. 103(a). The victim testified that her father molested her, and Tofoi testified that her daughter had told her of Defendant's conduct. The daughter's identification of her father as the perpetrator while being examined by Dr. Timoteo was, therefore, cumulative and did not "substantially sway" the jury's conclusion, particularly given that the primary issue was not the identity of the abuser, but whether the abuse had, in fact, occurred. *See United States v. Gabe*, 237 F.3d 954, 958-59 (8th Cir. 2001); *United States v. Norman T.*, 129 F.3d 1099, 1106 n.3 (10th Cir. 1997); *Ignacio*, 10 F.3d at 614.

Thus, the error in admitting Dr. Timoteo's testimony that the victim identified defendant as the abuser was harmless.

## III. Sufficiency of the Evidence

Defendant contends that there was insufficient evidence to support the jury's verdict. He points to the contradictions in the victim's testimony, such as the delay in reporting the sexual abuse, and to Tofoi's influence and motivation to imprison him. The government's response to the Defendant's motion for a new trial did not discuss the sufficiency of the evidence.

■ Sufficient evidence exists if, viewing the evidence in a light most favorable to the government, and drawing all reasonable inferences in favor of the jury's verdict, a reasonable jury could have found all elements of the offense beyond a reasonable doubt. *American Samoa Gov't v. Tauala*, 25 A.S.R.2d 179, 180 (Tr. Div. 1994); *see also United States v. Diaz-Cardenas*, 351 F.3d 404, 407 (9th Cir. 2003).

The trial court ruled that despite the somewhat degraded memory of the child about the actual times and places of the events she described, there was enough evidence that a crime had been committed, and that the Defendant was the perpetrator, to go to the jury. The daughter testified that Defendant had touched her vagina on January 1, 2001, and again during the month of February. (Trial Tr. 35-37.) A reasonable fact finder could credit this testimony, as well as Tofoi's and Dr. Timeoteo's, and conclude that Defendant had committed the acts alleged.

The jury's verdict is supported by sufficient evidence.

## Conclusion

Defendant's conviction is AFFIRMED.

It is so ordered.