**STATE of Minnesota, Respondent,**

v.

**Lennell Maurice MARTIN, Appellant.**

**No. A04–279.**

Supreme Court of Minnesota.

May 12, 2005.

---

John Stuart, State Public Defender, Lydia Villalva Lijo, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Robert M.A. Johnson, Anoka County Attorney, Marcy S. Crain, Asst. Anoka County Attorney, Anoka, MN, for Respondent.

## O P I N I O N

MEYER, Justice.

Lennell Maurice Martin appeals his conviction of premeditated first-degree murder, first-degree murder while committing a burglary, second-degree assault, and two counts of kidnapping. Martin's counsel raised two issues in this appeal: whether a statement made by the victim after he was shot was inadmissible under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), or under Minn. R. Evid. 804(b)(2) or 803(2), and whether the trial court's communications with the jury outside Martin's presence and without his personal waiver constituted reversible error. Martin raised eight other claims in a pro se supplemental brief. We affirm in part and remand for further proceedings.

Early in the morning of November 3, 2002, Precious Franklin got out of bed to check on the welfare of her 3–year–old son, R.E. She noticed a light on in the kitchen of her apartment. When she approached the kitchen to turn off the light, she saw two men, one armed with a gun and one with a long knife, aiming their weapons in her direction. Franklin later identified these men through photo lineups as Lennell Martin and Jeffery Young.

Franklin screamed and ran to her bedroom to wake up Curtis Anthony, her boyfriend. The men followed her, still aiming their weapons. Franklin's son, R.E., came in, calling for his mother, and joined Anthony and Franklin on the bed. When Anthony and Franklin pleaded with Martin and Young not to hurt R.E., Martin escorted Franklin and R.E. into the bathroom and shut them in.

Franklin heard Martin and Young interrogating Anthony and heard Anthony making noises as if in pain. After several minutes, Franklin heard a knock at the apartment door, then a gunshot, and the sound of people running from her apartment. Franklin then heard Anthony call her name, prompting her to leave the bathroom. Anthony was in the bedroom doorway, holding his chest. He gasped, "Call the police. Jeff and Lenair." He was bleeding profusely and appeared to be in great pain.

Franklin tried to use her cell phone to dial 911, but failed to make a connection. She ran to Kevin Tivis's apartment for help and learned that Tivis had already dialed 911. Tivis was already awake because he had heard Franklin's scream, and when he got out of bed to look around he saw a car parked in front of the building, which he later identified as a green Cadillac. It was Tivis who had knocked at Franklin's apartment door when Franklin was shut in the bathroom.

Franklin and Tivis returned to Franklin's apartment, where Tivis saw Anthony struggling to stand, and trying but failing to speak. When the police arrived, Anthony struggled with them. At one point he spit out blood and said, "I'm choking." Within a short time, Anthony lost consciousness and stopped breathing. He was pronounced dead an hour after arriving at the hospital.

Monica Green, Anthony's sister, called Franklin from the hospital and asked her what had happened. Franklin told her and mentioned that Anthony had said two names, "Jeff and Lenair." Green asked if Franklin meant "Jeff and Lennell," and Franklin responded, "Yes. That's it." Green told the police that "Jeff and Lennell" were cousins of Anthony's ex-girlfriend, Monique Frye.

Investigating officers interviewed Monique Frye on the morning of November 3,

2002. She gave them the full names of Jeffery Young and Lennell Martin, and told them that Martin drove a bluish-green Cadillac. The afternoon of the same day, Franklin picked Martin as the gunman from a six-person photo lineup. The next day, Franklin picked Jeffery Young as the other intruder from another six-person photo lineup.

Investigating officers located a 1992 green Cadillac El Dorado, registered to Martin's mother and parked behind her home. When the Cadillac was searched, police found bloodstains on the dashboard, steering wheel, and headlight switch. An expert witness on DNA tested the blood and determined that it matched the DNA profile obtained from Anthony.

In Jeffery Young's car police found a printout of directions to Anthony's apartment with handwritten notations of Anthony's first name and landmarks on the route to Anthony's apartment. A handwriting expert identified the notations as having been written by Young.

At trial, the medical examiner testified that Anthony's injuries included a shotgun wound to the chest involving a major artery and causing significant hemorrhaging; sharp-force defensive wounds to his thumbs and fingers; a broken thumb; a four-inch incision on the back of his scalp; and a stab wound in the neck, the force of which broke one of the larynx cartilages.

Martin testified on his own behalf at trial. According to Martin, he had gone to a couple of family celebrations on the night of November 2. At about 2 a.m. on November 3, he went with Young to the home of Young's sister, staying until around 6 or 7 a.m. They then left the sister's home and went to Young's house to sleep. Martin testified that he did not go to Franklin's apartment with Jeffery Young on November 3, nor did he shoot Anthony or point a gun at Franklin or her son.

During two days of jury deliberations, the jury had questions for the judge on four separate occasions and on each occasion the judge responded. The trial transcript does not mention any jury questions and the only record is certain notations made by the clerk and identified in Martin's district court file as "Anoka County District Court Minutes of Criminal Proceedings." The minutes note the date and time of the four jury questions, but do not describe either the questions asked by the jury or the responses given by the judge. Martin was not notified of the questions or the answers.

Martin was convicted of first-degree premeditated murder, first-degree murder while committing a burglary, second-degree assault against Franklin, and kidnapping of Franklin and her son. We affirm in part and remand.

I.

The trial court admitted into evidence without objection Anthony's statement, "Call the police. Jeff and Lenair." On appeal, Martin argues that this statement was inadmissible hearsay under the Minnesota Rules of Evidence and constitutionally barred under the holding in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The state's position is that *Crawford* bars only "testimonial" statements and because Anthony's statement was not testimonial, it was properly admitted. Additionally, the state asserts that Anthony's statement is admissible as an exception to the hearsay rule, either as a dying declaration or an excited utterance.

Generally, a defendant failing to object to proffered testimony at trial is deemed to have forfeited his right to have the error reviewed on appeal. *State v. Williams*, 525 N.W.2d 538, 544 (Minn.

1994). However, the issue may be reviewed on appeal if it constitutes plain error affecting substantial rights; that is, if the error had the effect of depriving the defendant of a fair trial. *Id.*; *see State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998).

## A.

We first consider whether Anthony's statement was a dying declaration and admissible as an exception to the hearsay rule. A trial court has broad discretion as to evidentiary matters, and a trial court's rulings on such matters will not be overturned on appeal absent a clear abuse of discretion. *State v. Chambers*, 589 N.W.2d 466, 475 (Minn.1999). Reversal is warranted only if there is any reasonable doubt the result would have been different had the evidence not been admitted. *State v. Litzau*, 650 N.W.2d 177, 182 (Minn. 2002).

Under the Minnesota Rules of Evidence, "a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death" is admissible in a homicide prosecution as an exception to the hearsay rule. Minn. R. Evid. 804(b)(2). In *State v. Elias*, we determined that in order for a dying declaration to be admissible, the profferor must show something more than simply that the declarant is aware of the seriousness of his or her injuries and the possibility of death. 205 Minn. 156, 158, 285 N.W. 475, 476–77 (1939). "Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be 'a settled hopeless expectation' that death is near at hand, and what is said must have been spoken in the hush of its impending presence." *Id.* at 159, 285 N.W. at 477 (internal citation omitted). Thus, the decisive factor is the declarant's state of mind.

*Id.*, 285 N.W. at 477; *see also State v. Bergeron*, 452 N.W.2d 918, 923 (Minn. 1990). The declarant's state of mind may be shown through direct evidence, such as a statement expressing the declarant's conviction of impending death, but also may be inferred from the surrounding circumstances. *State v. Buggs*, 581 N.W.2d 329, 335–36 (Minn.1998) (evidence that the declarant was shot "seven or eight times in her chest, abdomen, arm, and thigh," was found lying in a pool of blood, struggling to breathe, and died within hours after she was shot, was sufficient for the trial court to conclude that the declarant had a firm belief in her impending death even without an express statement to that effect by the declarant).

Martin argues that Anthony's statement was not admissible as a dying declaration because his statement gives no insight into how he perceived the severity of his injuries, and because the surrounding circumstances did not suggest that Anthony thought he was dying, since he was standing and walking when he made the statement. The state counters that this case is analogous to *Buggs* because Anthony had multiple wounds, was bleeding profusely, and was struggling to breathe. We agree with the state's position because the evidence suggests Anthony recognized the severity of his wounds and believed death was imminent. He had been stabbed in the neck, piercing his larynx, and shot in the chest, severing a major artery. His bleeding was severe, and he clutched his chest as he spoke. Minutes later he was unable to walk and told police he could not breathe. Minutes after that, Anthony stopped breathing and first responders could not locate a pulse. Within an hour he was dead. Considering the circumstances surrounding Anthony's statement, it is evident that this statement qualifies as a dying declaration, admissible as a hear-

say exception under Minn. R. Evid. 804(b)(2). Therefore, we conclude that the trial court did not abuse its discretion in admitting Anthony's statement under the hearsay exception for dying declarations.

### B.

■ We next consider Martin's constitutional objection assuming, without deciding, that he did not forfeit this claim by failing to object on this basis at trial. The Sixth Amendment to the United States Constitution provides that an accused has the right to be confronted with witnesses. Martin argues that his constitutional right to confront a witness was violated by the admission of Anthony's statement, citing *Crawford*. In *Crawford*, the defendant was accused of stabbing another man who allegedly attempted to rape the defendant's wife. 541 U.S. at 38, 124 S.Ct. 1354. Although the wife did not testify at trial because of the state's marital privilege law, her tape-recorded statement to the police, given while she was under investigation and after she was given a *Miranda* warning, was admitted into evidence at trial under the hearsay exception for statements against penal interest. *Id.* at 38, 40, 124 S.Ct. 1354. The defendant maintained that admitting this statement when he had no opportunity to cross-examine the witness violated his federal constitutional right to be "confronted with witnesses against him." *Id.* at 40, 124 S.Ct. 1354.

In a previous case, *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court set forth a test for admissibility that admits an out-of-court statement by an unavailable witness if the statement bears "adequate indicia of reliability," defined as either hearsay falling within "a firmly rooted hearsay exception" or bearing "particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. 2531. However, the *Crawford* Court found that for testimonial statements, the *Roberts* test departed from historical constitutional principles, and often failed to protect against "paradigmatic confrontation violations." *Crawford*, 541 U.S. at 59, 124 S.Ct. 1354. Therefore, the *Crawford* Court determined that the Confrontation Clause of the United States Constitution bars admission of testimonial statements of witnesses who do not appear at trial unless (1) they are unavailable to testify, and (2) the defendant has had a prior opportunity to cross-examine them. *Id.* at 53–54, 124 S.Ct. 1354. The Court thus announced a new test for the admissibility of those statements that are "testimonial" but left the *Roberts* test in place for nontestimonial statements, determining that the *Roberts* test affords needed flexibility to the states in their development of hearsay law. *See Crawford*, 541 U.S. at 68, 124 S.Ct. 1354.

■ According to the *Crawford* Court, testimonial statements include, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and * * * police interrogations." *Id.* Unfortunately, the *Crawford* Court "left for another day" any effort to spell out a comprehensive definition of those statements that are "testimonial" and thus admissible only if the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. *Id.* In this case, both parties ask us to give some definition to "testimonial" and then apply that definition to Anthony's dying declaration. We are not unsympathetic to the uncertainty that has been generated by the Supreme Court's refusal to articulate a comprehensive definition of "testimonial" statements.[1] But, we need

---

**1.** The majority in *Crawford* itself acknowledged that its "refusal to articulate a comprehensive definition [of 'testimonial'] in this case will cause interim uncertainty." 541 U.S. at 68 n. 10, 124 S.Ct. 1354.

not decide in this case whether Anthony's statement was testimonial and, therefore, this court must also "leave for another day" any effort to discern the Supreme Court's meaning of "testimonial." In this case, we conclude that the Sixth Amendment incorporates an exception for dying declarations and Anthony's dying declaration was admissible as an exception to the *Crawford* rule. Our reasoning follows.

The *Crawford* Court relied heavily on the intent of the framers of the Constitution and the right of confrontation as it existed at common law in defining the parameters of the Confrontation Clause, "admitting only those [hearsay] exceptions established at the time of the founding." *Id.* at 54, 124 S.Ct. 1354. The Court stated that there is "scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a *criminal* case" at common law. *Id.* at 56, 124 S.Ct. 1354. However, the Court noted that "[t]he existence of [the dying declaration] exception as a general rule of criminal hearsay law cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are." *Id.* n. 6 (internal citations omitted). The Court cited *Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895), to demonstrate the well-rooted nature of the exception for dying declarations at common law. *Crawford,* 541 U.S. at 54, 56 n. 6, 124 S.Ct. 1354. "[F]rom time immemorial [dying declarations] have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility." *Mattox,* 156 U.S. at 243–44, 15 S.Ct. 337. The *Crawford* Court did not squarely hold that an exception exists under *Crawford* for dying declarations. *See* 541 U.S. at 56, 124 S.Ct. 1354. Yet the Court's statement that the Con-

frontation Clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding" strongly suggests that because dying declarations were a recognized common-law exception at the time of the founding, there is no inherent conflict in continuing to recognize them today. *See id.* at 54, 124 S.Ct. 1354.

The Supreme Court of California has held that *Crawford's* Sixth Amendment concerns are not implicated for dying declarations. *People v. Monterroso,* 34 Cal.4th 743, 22 Cal.Rptr.3d 1, 101 P.3d 956 (2004).

> [I]f, as *Crawford* teaches, the confrontation clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding," it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment.

*Id.* at 972 (internal citations omitted). We agree with the California Supreme Court's conclusion about *Crawford's* teaching: Before adoption of the United States Constitution, dying declarations were admissible at common law, and the common law "was not repudiated by our constitution * * * but adopted and cherished." *Id.* at 972 (quoting *State v. Houser,* 26 Mo. 431, 438 (1858); *accord Mattox,* 156 U.S. at 243–44, 15 S.Ct. 337). We hold that the admission into evidence of a dying declaration does not violate a defendant's Sixth Amendment right to confrontation within the meaning of *Crawford* because an exception for dying declarations existed at common law and was not repudiated by the Sixth

Amendment.[2]

## II.

 We turn to the question of whether it was reversible error for the trial court judge to have four different communications with the jury that occurred without Martin's presence, knowledge, or consent. Minnesota Rule of Criminal Procedure 26.03, subdivision 1, states that the defendant shall be present "at every stage of the trial." In *State v. Thompson*, this court held that the right to be present at trial is broader under the Minnesota Rules of Criminal Procedure than is required by the United States Constitution. 430 N.W.2d 151, 152–53 (Minn. 1988). Responding to a deliberating jury's question is a stage of trial. *State v. Sessions*, 621 N.W.2d 751, 755 (Minn.2001). While the defendant can waive his right to be present at a stage of trial, the decision to waive the right is "not for counsel to make but a personal decision for defendant to make after consultation with counsel." *State v. Ware*, 498 N.W.2d 454, 457 (Minn. 1993).

 In addition, the rules of criminal procedure explicitly require the defendant's presence, or personal waiver, when a deliberating jury makes a request to review testimony or other evidence or asks to be informed on any point of law. Minn. R.Crim. P. 26.03, subd. 19(2)–(3). Moreover, the jury must be brought into open court and the prosecutor and defense counsel must be notified. *Id.*; *see also Mckenzie v. State*, 670 N.W.2d 582, 583

(Minn.2003); *Sessions*, 621 N.W.2d at 756. "Thus, the general rule in Minnesota is that a trial judge should have no communication with the jury after deliberations begin unless that communication is in open court and defendant is present." *Ford v. State*, 690 N.W.2d 706, 712 (Minn.2005).

Martin argues that the trial court erred by failing to have him present when the court responded to certain jury questions and by failing to secure his waiver of the right to be present. He concedes that the record establishes that ten of the fourteen contacts concerned housekeeping matters but argues that the remaining four contacts likely did not concern housekeeping matters because the record is silent about their purpose. Therefore, his right to be present at all stages of the trial was violated, necessitating a new trial. The state argues that the trial court did not err because the circumstances indicate that the jury questions simply dealt with housekeeping matters. Before deliberations began, the court and the attorneys, in Martin's presence and on the record, discussed and agreed to the circumstances under which the court would contact the parties and bring the jurors into open court, agreeing that it would be unnecessary to take these steps in the case of housekeeping matters. Given this agreement, the state asks us to infer that the trial court judge's communications with the jury concerned housekeeping matters.

We recently held that "when a judge communicates in writing with the jury about a housekeeping matter, the defen-

---

**2.** Two other state supreme courts have confronted the question of the admissibility of dying declarations since *Crawford*. The Supreme Court of Kansas held that the defendant forfeited his confrontation right by procuring the unavailability of a witness; i.e., killing the maker of the dying declaration. *State v. Meeks*, 277 Kan. 609, 88 P.3d 789, 794–95 (2004) (basing its holding on the

*Crawford* Court's acceptance of the rule of forfeiture by wrongdoing that extinguishes confrontation claims on essentially equitable grounds). The Georgia Supreme Court declined to address the issue, holding that the defendant's failure to raise a Sixth Amendment objection at trial precluded consideration of the issue on appeal. *Walton v. State*, 278 Ga. 432, 603 S.E.2d 263, 265 (2004).

dant's right to be present at trial is not violated." *Ford,* 690 N.W.2d at 713. However, we cautioned that "any doubt regarding whether a communication relates to a housekeeping or substantive matter should be resolved in favor of defendant's presence" and that "a record should be made of all communication between the judge and the jury, regardless of its substance." *Id.* Our review of the record leaves us with some doubt as to whether the four communications at issue relate to housekeeping matters or substantive matters. Because there is some doubt about the nature of the communications, we remand to the trial court to make a record of the four communications at issue, so that we may make an informed decision regarding the matter. We retain jurisdiction of this case, ordering that upon completion of the record, the additional record be certified to this court for inclusion in the appellate court file in this matter. The trial court shall forward the completed record within 90 days of this decision's filing, appellant shall file a brief, if any, in this court within 15 days of the trial court's filing, and respondent shall file its brief, if any, in this court 10 days thereafter.

### III.

■ In his pro se supplemental brief, Martin raises several additional arguments in support of his request for a new trial. He argues that the photo lineup procedure, the alleged destruction of evidence, and the amendment of the indictment with additional charges violated his due process rights; that the state committed prosecutorial misconduct; that the trial court judge erred in giving the jury an instruction based on CRIMJIG 3.04 and in failing to order the removal of Martin's leg restraint; and that he received ineffective assistance of trial counsel. We have reviewed each of Martin's pro se claims and find them to be without merit, with the exception of Martin's claim of ineffective assistance of counsel.

■ In *Strickland v. Washington,* the United States Supreme Court held that in order to demonstrate ineffective assistance of counsel, an appellant must show that "representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Opsahl v. State,* 677 N.W.2d 414, 421 (Minn.2004). A reasonable probability is "'a probability sufficient to undermine confidence in the outcome.'" *State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). There is a strong presumption that counsel's performance was reasonable. *Jones,* 392 N.W.2d at 236. An appellant claiming to have received ineffective assistance of counsel bears the burden of proof on his or her claim. *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998). We give particular deference to trial strategy, *id.,* and have stated that "[w]hich witnesses to call at trial and what information to present to the jury are questions that lie within the proper discretion of the trial counsel." *Jones,* 392 N.W.2d at 236.

Martin argues that his trial counsel (1) failed to hire an investigator to investigate "how Ms. Franklin got the name, Lennell instead of Lenair"; (2) failed to contest "the amending of the indictment to include additional charges—rather than adding a lesser included offense"; (3) failed to challenge police interference with the photo lineup; (4) failed to retain an expert DNA witness to challenge any and all evidence found in his vehicle; and (5) failed to retain an investigator to perform an exten-

sive investigation to assist in preparation of his defense.

■ The general rule under *Knaffla* is that all known claims must be brought on direct appeal, and are procedurally barred in a subsequent postconviction proceeding. *State v. Knaffla*, 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976). However, "a claim of ineffective assistance of trial counsel that cannot be decided on the district court record because it requires additional evidence need not be brought on direct appeal and may be brought in a postconviction petition." *Torres v. State*, 688 N.W.2d 569, 572 (Minn.2004). *See also State v. Gustafson*, 610 N.W.2d 314, 321 (Minn.2000) (holding that where the defendant raised claims that required additional fact-finding to explain the attorney's decisions, a postconviction hearing was the appropriate forum). In the present case, it is not possible to determine from the existing record the basis for Martin's trial counsel's decisions not to retain an investigator or an expert DNA witness. The trial record, understandably, is silent about the reasons for trial counsel's decisions in this regard. If Martin decides to further pursue his claims of ineffective assistance of trial counsel, he may do so in a postconviction proceeding, and his claims will not be procedurally barred under the *Knaffla* rule if additional evidence is produced in support of his claims.

Affirmed in part and remanded.