STATE of Minnesota, Respondent,

v.

Andre ROBINSON, Appellant.

No. A04–840.

Supreme Court of Minnesota.

July 20, 2006.

Rehearing Denied Aug. 4, 2006.

Mike Hatch, Minnesota Attorney General, Saint Paul, MN, Amy Klobuchar, David C. Brown, Hennepin County Attorney's Office, Minneapolis, MN, for Respondent.

Davi E. Axelson, Assistant State Public Defender, Minneapolis, MN, for Appellant.

## OPINION

HANSON, Justice.

Appellant Andre Robinson appeals from his conviction of third-degree assault against F.T., the mother of his children. At trial F.T. testified that Robinson caused her injuries but did so accidentally, which was contrary to what she initially told two hospital nurses. Robinson argues that the district court erred in allowing the substantive admission of F.T.'s statements to the nurses under the medical diagnosis

and treatment hearsay exception, Minn. R. Evid. 803(4). The court of appeals agreed, but concluded that the statements were admissible under the residual hearsay exception, Minn. R. Evid. 803(24), and as nonhearsay statements of identification under Minn. R. Evid. 801(d)(1)(C). *State v. Robinson*, 699 N.W.2d 790, 795–99 (Minn. App.2005). We affirm the court of appeals on the residual hearsay exception.

At around 8:55 a.m. on April 12, 2003, F.T. checked into Abbott Northwestern Hospital for treatment of several injuries, the most serious of which was swelling of her left eye. She told one of the treating nurses that the father of her children and former boyfriend, Robinson, hit her in the eye with an open hand. F.T. was diagnosed with a blowout fracture of her eye orbit and was referred to an ophthalmologist for follow-up treatment. About 10 days after the incident F.T. went to the Domestic Abuse Service Center for information about obtaining an order for protection against Robinson. The same day, F.T. also met with a police officer and gave a taped statement detailing the assault by Robinson. She also signed a medical release form that said "THIS INFORMATION IS TO BE RELEASED FOR THE PURPOSE OF * * * Police Investigation."

F.T. did not seek an order for protection and began living with Robinson again. About a month after the incident F.T. learned that Robinson was being charged and she called the prosecutor with a new version of how her eye orbit fracture occurred. F.T. acknowledged that she and Robinson had argued and that at one point she had gone into the bathroom. But she said that her eye was injured by accident when Robinson opened the bathroom door and the door struck her eye. F.T. also sent a notarized letter to the public defender's office detailing this account.

Robinson was charged with third-degree assault, Minn.Stat. § 609.223, subd. 1 (2004), and interference with an emergency call, Minn.Stat. § 609.78, subd. 2 (2004). At a pretrial hearing, the state provided the court with copies of six documents: (1) the nurses' assessment form completed by nurse J.W.; (2) the nurses' assessment form completed by nurse A.S.; (3) the police report of an interview with F.T. on April 12, 2003; (4) the transcript of the police statement taken from F.T. on April 22, 2003; (5) a memorandum from an investigator in the Hennepin County Attorney's Office summarizing a telephone call from F.T. on June 26, 2003; and (6) a letter from F.T. to the Office of the Public Defender dated August 25, 2003. After extensive argument, the court ruled that F.T.'s statements to police were inadmissible as hearsay and the court reserved ruling on the memorandum of the telephone call from F.T. and F.T.'s letter to the public defender. But the court determined that F.T.'s statements to the nurses were admissible substantively under the medical diagnosis hearsay exception, Minn. R. Evid. 803(4). The ruling contemplated that the nurses would be permitted to use the assessment forms to refresh their recollections, but the forms would not be admitted as exhibits. The court rejected the state's arguments that the statements to the nurses were also admissible as nonhearsay statements of identification, Minn. R. Evid. 803(4), and under the residual hearsay exception, Minn. R. Evid. 803(24).

At trial the state first introduced testimony from the staff nurse, J.W. J.W. testified that as a staff nurse she is responsible for interviewing patients and conducting a preliminary physical assessment. She testified that a necessary component of this assessment is determining how the injury occurred. J.W. documented her actions and findings on a one-page form titled

"Emergency Department Nursing Assessment and Treatment."

J.W. used the assessment form to refresh her memory because she had no independent recollection of the incident. She said that F.T.'s left eyelid was swollen and she was holding it shut with an ice pack. J.W. asked F.T. what happened and F.T. replied, "[M]y kids' dad came over drunk; got to argue with me and then open hand slapped me really hard on the face." J.W. asked if this had ever happened before. F.T. responded that she "never had been assaulted before." J.W. also testified that she wrote down: "[P]atient says he wouldn't let me out. He fell asleep and I left with the kids."

After completing the assessment form, J.W. notified the on-duty nurse practitioner, A.S. A.S. testified that a nurse practitioner has more training than a staff nurse and therefore is allowed to diagnose and treat cases, like F.T.'s, that are less complex. A.S. documented her examination of F.T. on a more detailed form titled "ED/MD Evaluation and Treatment." A.S. refreshed her memory with this form because she also had no independent recollection of the incident.

A.S. testified that she observed swelling over F.T.'s left eye, an abrasion on her nose next to her eye, a scratch on her eyeball, and a chipped tooth. A.S. asked F.T. why she came to the hospital and F.T. told her that she had been assaulted. When asked how she was assaulted, F.T. said she had been slapped in the face. Although A.S.'s assessment form states the identity of F.T.'s abuser as her "boyfriend," A.S. testified that F.T. did not say who slapped her.

A.S. ordered a CT scan and the neuroradiologist told her that F.T. had a blowout fracture of the left orbit, the bone around the eye. A.S. treated the eye scratch with eye drops and referred F.T. to an ophthal-

mologist to treat the fracture. There is no indication that the hospital staff conducted any other follow-up treatment.

After presenting the testimony of the two nurses, the state called F.T. to testify. She stated that she was sleeping early in the morning on April 12, 2003, when Robinson started knocking loudly on her door. She let him in and they began arguing about a woman Robinson had been with. She eventually went into the bathroom and they began arguing through the closed door. After the argument deescalated, F.T. peeked out the door to see if Robinson was still there and Robinson pushed the door open, causing it to hit her. She described it as an accident. F.T. said they went to sleep and when she woke up a few hours later her eye still hurt so she drove herself and their two kids to the hospital.

F.T. admitted that she had made the accusatory statements to the nurses, but said she lied because she was mad at Robinson for being out with another woman and wanted to get him in trouble. She also admitted that she went to the Domestic Abuse Service Center 10 days later to get information on an order for protection against Robinson, but said she did not actually obtain an order. She explained that she needed time away from him and wanted him to think that he had to stay away. As for the medical release form, F.T. said she signed a form but thought it was authorizing the release of her medical information to her doctor or insurance company.

To discredit F.T.'s new version of how she was injured, the state presented testimony from the neuroradiologist who treated her. He testified that F.T.'s fracture was the result of pressure being applied to her eyeball, which created force in the socket that caused two thin bones in her orbit walls to break. He testified that this

type of injury can only be caused by a rounded object, like a ball, fist or vehicle dashboard. He admitted that he has never personally treated an orbit fracture that he knew was caused by an open hand, but testified that it is theoretically possible and has been documented in scholarly articles. He also testified that it was not possible for the edge of a door to have caused F.T.'s injury.

The jury found Robinson guilty of third-degree assault. He appealed his conviction, claiming, among other things, that the district court erroneously admitted F.T.'s two statements to the nurses. *Robinson*, 699 N.W.2d at 792–93. The court of appeals affirmed, agreeing that the statements were admissible but on different grounds. *Id.* at 799. The court held the statements were not admissible under the medical diagnosis exception but were admissible under both the residual exception to hearsay and as nonhearsay statements of identification. *Id.* at 797, 799. We granted review.

## I.

At the outset it is helpful to identify the specific portion of F.T.'s statements to which Robinson objects. The portion that the district court and the court of appeals focused on was F.T.'s identification of Robinson as the person who caused her injury. At oral argument Robinson seemed to suggest that he is also objecting to the portions of F.T.'s statements that describe the mechanism of her injury as a hand slap. On this latter aspect, the law is clear.

■ The medical diagnosis exception to the hearsay rule applies to "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, *or the inception or general character of the cause or external source thereof* insofar as reasonably pertinent to diagno-

sis or treatment." Minn. R. Evid. 803(4) (emphasis added). The rationale behind the rule is "the patient's belief that accuracy is essential to effective treatment." 2 John W. Strong, et al., *McCormick on Evidence* § 277, at 247 (4th ed.1992). This "special assurance of reliability * * * also applies to statements concerning the cause" of the condition. *Id.* Thus F.T.'s description of a hand slap as the mechanism of her injury is admissible under the medical diagnosis exception provided in Rule 803(4).

■■ As to the portions of F.T.'s statements that identified Robinson as the person who caused her injury, the district court did not apply the elements of Rule 803(4) to the specific circumstances surrounding the making of F.T.'s statements. Instead, the court adopted a categorical rule of admissibility under the medical diagnosis exception for statements of identification by victims of domestic abuse. The court reasoned that "the medical value goes to identifying the source of the injury in order to protect the * * * victim from the injury [and] to counsel the victim." Because the district court made a strictly legal determination without exercising discretion, we review its decision de novo. *See Shirk v. Shirk*, 561 N.W.2d 519, 520 (Minn.1997).

■ In contrast to the general notion that statements explaining the cause of an injury are admissible under the medical diagnosis exception, statements attributing fault, including statements identifying the accused perpetrator, are ordinarily not admissible. *See United States v. Iron Shell*, 633 F.2d 77, 84 (8th Cir.1980); Strong, *supra*, § 277, at 248. The state concedes that this is the general rule, but compares statements of identification by domestic abuse victims to statements of identification by victims of child sexual abuse that

were held to be admissible under the medical diagnosis exception in several cases. *See United States v. Renville,* 779 F.2d 430, 437–39 (8th Cir.1985); *State v. Salazar,* 504 N.W.2d 774, 777–78 (Minn.1993); *State v. Larson,* 453 N.W.2d 42, 47 (Minn.), *judgment vacated on other grounds,* 498 U.S. 801, 111 S.Ct. 29, 112 L.Ed.2d 7 (1990). The district court accepted this argument because it believed that "a domestic partner * * * as an abuser would be * * * the equivalent of the parent who is abusing the child."

The state and the district court proceeded under the assumption that statements of identification by child sexual abuse victims are always admissible under the medical diagnosis exception. We have not adopted such a broad rule. In *Larson* we upheld the admission of an extrajudicial statement of identification by a four-year-old child under the medical diagnosis exception. 453 N.W.2d at 43, 47. Without discussing the propriety of a categorical rule of admissibility, we cited two cases that admitted similar statements and simply said, "We agree with the reasoning of these cases on this particular point." *Id.* at 47 (citing *United States v. DeNoyer,* 811 F.2d 436, 438 (8th Cir.1987), and *Goldade v. State,* 674 P.2d 721, 725 (Wyo.1983)).

The Eighth Circuit subsequently interpreted *Larson* as adopting a categorical rule. *See Dana v. Dep't. of Corr.,* 958 F.2d 237, 239 (8th Cir.1992). But our subsequent decision in *Salazar* undercuts this interpretation. In *Salazar* we affirmed the admission of a statement by a five-year-old child to a social worker accusing the defendant of sexual abuse. 504 N.W.2d at 776, 778. In doing so, we recognized that "[t]he mere fact that a child's statements are made to a doctor does not render the child's statements admissible under [Rule] 803(4)." *Id.* at 777. We said that the "statements are admissible only if the evidence suggests that the child knew she was speaking to medical personnel and that it was important she tell the truth." *Id.* Thus we recognized the importance of examining each statement individually and applying the facts on a case-by-case basis.

The court of appeals declined to adopt a categorical rule of admissibility for statements of identification by victims of domestic abuse. *See Robinson,* 699 N.W.2d at 795. We are similarly reluctant to adopt a categorical rule of admissibility under the medical exception.

We are very familiar with the legal issues concerning domestic violence. As early as September 1989, our Task Force on Gender Fairness in the Courts alerted us to the thousands of cases of domestic abuse reported each year and the critical need to assure that domestic abuse victims receive both civil and criminal legal relief. *Minnesota Supreme Court Task Force for Gender Fairness in the Courts,* 15 Wm. Mitchell L.Rev. 829, 871–91 (1989). As the task force noted, the legislature has enacted progressive domestic abuse laws.[1] *Id.* at 872. Our case law has also recognized the unique legal needs of victims of domestic violence.[2]

---

**1.** *See* Minn.Stat. §§ 518B.01 (2004) (Domestic Abuse Act), 518B.02 (2004) (domestic abuse counseling program), 609.185(a)(6) (2004) (domestic abuse murder), 609.2242 (2004) (domestic assault), 609.2243 (2004) (sentencing domestic assault offenders), 611A.31–36 (2004) (victim rights for battered women), 629.341 (2004) (probable cause arrests for domestic violence; immunity from liability), 629.342 (2004) (law enforcement responses to domestic violence), 629.72 (2004) (detention, bail, and release terms for domestic abuse offenders).

**2.** *State v. Wright,* 701 N.W.2d 802, 814–15 (Minn.2005) (noting that a "forfeiture by wrongdoing analysis," to avoid a Confrontation Clause issue where the defendant has procured the unavailability of the victim, is

But we are not as familiar with the medical issues concerning domestic violence. We are not able to determine, by judicial notice or general knowledge, whether the notion that the identification of the perpetrator of domestic violence is reasonably pertinent to medical diagnosis and treatment is generally accepted in the medical profession. To this extent, the medical exception to the hearsay rules depends, in the first instance, on the views of the medical profession, not on the views of the courts. We can speculate that the medical profession may have evolved to recognize the importance of treating the whole person of a victim of domestic violence, including the emotional and psychological effects of past violence and the potential of future violence. But we can do no more than speculate. The record before us contains no medical expert testimony on the scope of the customary treatment of a victim of domestic violence or whether the identity of the domestic abuser is reasonably pertinent to that treatment.

On appeal, the state relies heavily on a 1992 publication by the American Medical Association that concludes "[d]omestic violence and its medical and psychiatric sequelae are sufficiently prevalent to justify *routine screening* of all women patients in emergency, surgical, primary care, pediatric, prenatal, and mental health settings." Am. Med. Ass'n, *Diagnostic and Treatment Guidelines on Domestic Violence* 8 (March 1992), http://www.ama-assn.org/ama1/pub/upload/mm/386/domesticviolence.pdf, hereinafter "AMA Guidelines". The stated goals of the publication are to familiarize hospital staff with the magnitude of the domestic violence problem, help them identify domestic violence and its impact on a patient's health and well-being, provide them with interviewing strategies, provide them with information on referral options, and familiarize them with the legal aspects of providing medical care to domestic violence victims. *Id.* at 5.

But the AMA Guidelines contain a specific disclaimer that they "are not intended to be construed or to serve as a standard of medical care." Id. at 2. Apparently, they impose no obligations on health care providers in collecting information on domestic violence, in providing emotional or psychological treatment, or even in referring victims for this type of care. *See id.* In short, although the Guidelines suggest domestic violence screening, they do not state that such screening is reasonably pertinent to medical diagnosis or treatment.

Moreover, the AMA Guidelines are evidentiary in nature and were not made a part of this record. *See Hinneberg v. Big Stone County Hous. & Redev. Auth.*, 706 N.W.2d 220, 224 (Minn.2005) (striking an email, letter, and other statistical information from briefs because it was evidentiary in nature and was not in the record). They also do not constitute the type of information that is subject to judicial notice. *See* Minn. R. Evid. 201(b) (defining a judicially noticed fact as a fact generally known or "capable of accurate and ready

"particularly suitable for cases involving domestic violence" because "perpetrators of domestic violence frequently intimidate their victims with the goal of preventing those victims from testifying") *vacated on other grounds,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); *State v. Glowacki,* 630 N.W.2d 392, 401–02 (Minn.2001) (recognizing the realities facing victims of domestic violence and eliminating the duty to retreat from one's own home when acting in self-defense in the home); *State v. Hennum,* 441 N.W.2d 793, 798 (Minn.1989) (recognizing the value of battered women syndrome evidence to dispel common misconceptions, bolster the battered woman's credibility, and show the reasonableness of fear of bodily harm).

determination by resort to sources whose accuracy cannot reasonably be questioned"); *State v. Friberg,* 435 N.W.2d 509, 519 (Minn.1989) (Popovich, J., dissenting).

We conclude that the categorical rule of admissibility that the state urges us to adopt is too broad. It ignores variables such as the seriousness of the assault, the frequency of the abuse against the victim, the type of domestic relationship, or the presence or absence of emotional or psychological harm. These variables can affect the pertinence of a statement of identification to medical diagnosis or treatment. *See* AMA Guidelines, *supra,* at 5 (defining domestic violence as "a pattern of coercive behaviors that may include repeated battering and injury, psychological abuse, sexual assault, progressive social isolation, deprivation, and intimidation").

Turning to the record before us, the state did not present evidence of a pattern of coercive behavior, repeated battering, or psychological abuse; that F.T. displayed or sought treatment for emotional or psychological harm; or that the nurses were concerned about F.T.'s emotional or psychological well-being. And there is no medical expert testimony explaining why Robinson's identity as the assailant was relevant to the diagnosis or treatment of F.T.'s eye injury.

We do not foreclose the possibility that we might in the future adopt a properly limited categorical rule of admissibility under the medical exception to hearsay for statements of identification by victims of domestic violence.[3] Nothing in this decision should be interpreted as preventing or discouraging hospitals from conducting routine screening for domestic abuse for any or all patients. And we do not suggest that accusations by victims of domestic abuse are unreliable. We only hold that where, as here, there is an insufficient evidentiary foundation to establish that the identity of the person who caused an injury was reasonably pertinent to the medical diagnosis or treatment of that injury, the statement of identity is not admissible under Rule 803(4).

## II.

■ Having concluded that the district court erred in ruling F.T.'s statements admissible under the medical exception, we now turn to the question of whether the error was harmless. Erroneous admission of evidence that does not have constitutional implications is harmless if there is no "reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Post,* 512 N.W.2d 99, 102 n. 2 (Minn.1994). The state argues that the error was harmless because F.T.'s statements of identification were admissible on other grounds, either (1) as nonhearsay statements of identification under Minn. R. Evid. 801(d)(1)(C), or (2) under the residual hearsay exception, Minn. R. Evid. 803(24).

A. *Nonhearsay Statement of Identification, Minn. R. Evid. 801(d)(1)(C)*

■ Under Minn. R. Evid. 801(d)(1)(C) "[a] statement is not hearsay if * * * [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * one of identification of a person

---

**3.** If we were to do so, it would likely require a process akin to a *Frye–Mack* hearing to establish that the proposition that the identity of the perpetrator of domestic violence is pertinent to medical diagnosis and treatment of the victim is generally accepted within the medical profession. *See, e.g., State v. Roman Nose,* 649 N.W.2d 815, 821 (Minn.2002); *State v. Schwartz,* 447 N.W.2d 422, 424 (Minn.1989). This process must begin at the district court and have a sufficient evidentiary foundation.

made after perceiving the person, if the court is satisfied that the circumstances of the prior identification demonstrate the reliability of the prior identification." The issue here is over the definition of "prior identification."

The court of appeals relied on its prior decision in *State v. Hogetvedt,* 623 N.W.2d 909, 913–14 (Minn.App.2001), and held that Rule 801(d)(1)(C) is not limited to police lineups, showups, or other similar procedures, but extends to any statement identifying an offender, known or unknown, so long as the identification satisfies the reliability requirement. *Robinson,* 699 N.W.2d at 796–97. The state acknowledges that the "vast majority of cases" apply Rule 801(d)(1)(C) in the context of a police lineup, showup, or other similar procedure, but asks this court to affirm the court of appeals because there is nothing in the rule specifically limiting its application to these situations. We decline to do so.

Robinson makes an important distinction between an "identification" of an unknown offender, which is covered by Rule 801(d)(1)(C), and an "accusation" of a known offender, which is not. *See also United States v. Kaquatosh,* 242 F.Supp.2d 562, 565 (E.D.Wis.2003). The rationale behind the rule "stems from the belief that if the original identification procedures were conducted fairly, the prior identification would tend to be more probative than an identification at trial." Minn. R. Evid. 801(d)(1) comm. cmt.—1989. This rationale applies to cases involving the prior identification of an unknown offender, where the in-court identification is so highly suggestive that it would be misleading if the jury were allowed to believe that this was the witness's only identification of the offender. Rule 801(d)(1)(C) was adopted to remedy this unique problem. But in the case of a known offender, we see no reason to prefer a witness's out-of-court accusation over his or her in-court accusation. We hold that Rule 801(d)(1)(C) does not extend to the out-of-court accusation against an offender whose identity was well-known to the victim.

## B. *Residual Hearsay Exception, Minn. R. Evid. 803(24)*

■ The residual hearsay exception admits statements

> not specifically covered by any of the foregoing [hearsay] exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Minn. R. Evid. 803(24). The state relies on our decision in *State v. Ortlepp,* where we cited four reasons for affirming the substantive admission of a police confession by the defendant's co-conspirator who recanted at trial because he said his statement was coerced and thus not true. 363 N.W.2d 39, 42, 44 (Minn.1985). The state seems to interpret this as establishing a four-factor test for admissibility of any evidence under Rule 803(24).

■ We have made clear that the proper analysis under the residual exception is to use "the 'totality of the circumstances' approach, looking to all relevant factors bearing on trustworthiness" to determine whether the extrajudicial statement has "circumstantial guarantees of trustworthiness" equivalent to the other Rule 803 hearsay exceptions. *See State v. Byers,* 570 N.W.2d 487, 492 (Minn.1997) (interpreting the catch-all provision under Minn.

R. Evid. 804(b)(5)); *see also State v. Edwards*, 485 N.W.2d 911, 915 (Minn.1992) (examining the circumstances of the statement admitted under Rule 803(24)); *Ortlepp*, 363 N.W.2d at 44 (explaining that Rule 804(b)(5) and 803(24) are identical). The four factors "test" we cited in *Ortlepp* was an application of the totality of the circumstances approach to satisfy the "equivalent circumstantial guarantees of trustworthiness" element of Rule 803(24).

■ Robinson points out that the district court specifically ruled F.T.'s statements were not admissible under the residual exception. Robinson argues that we should give deference to this determination. But the only factor that the district court mentioned as a consideration bearing on trustworthiness was that the testimony by the neuroradiologist supported F.T.'s extrajudicial version of how the injury occurred. The district court believed that it could not consider this "corroborating" evidence—as distinguished from evidence of trustworthiness surrounding the making of the statements—because of the United States Supreme Court's interpretation of the Confrontation Clause in *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

■ The Confrontation Clause does not apply here because, unlike the declarant in *Wright*, F.T. testified and was subject to cross-examination. *See id.* The district court determined that *Wright* is controlling even when the declarant testifies because "[c]onfrontation arises whenever you have a statement that was not confronted at the time it was originally made." But this reasoning has been rejected by the Supreme Court. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *see also California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (holding Confrontation Clause was not violated if declarant testifies and is subject to cross-examination); *Oliver v. State*, 502 N.W.2d 775, 778 (Minn.1993) ("[T]here is no confrontation problem presented by the admission of the prior statement as substantive evidence because [the declarant] testified."); *Ortlepp*, 363 N.W.2d at 44 (same); *State v. Gustafson*, 266 N.W.2d 878, 879 (Minn.1978) (same). Thus, the Confrontation Clause poses no barrier to our consideration of evidence corroborating F.T.'s statements.[4]

Because the district court incorrectly determined that it could not consider the evidence corroborating F.T.'s statements of identification and failed to identify or consider any other relevant factors bearing on trustworthiness, we afford no deference to its decision on the residual exception. In the ordinary course, we could remand the issue to the district court to exercise discretion. But, because the facts relevant to trustworthiness are undisputed and the applicability of the residual exception arises in the context of a harmless error analysis, it is appropriate for us to determine admissibility of the statements under Rule 803(24) as a legal issue. *See Oliver*, 502 N.W.2d at 778–79 (holding defendant had "no ground for complaint about" admission of a prior inconsistent statement to impeach a recanting witness because the statement was admissible substantively under the residual exception); *Edwards*, 485

---

4. Nor does the residual exception itself prevent us from considering corroborating evidence. The rule contains no specific limitation and we have considered such evidence in other cases. *See* Minn. R. Evid. 803(24); *State v. Byers*, 570 N.W.2d at 493; *Oliver*, 502 N.W.2d at 778; *Ortlepp*, 363 N.W.2d at 44.

N.W.2d at 915 (holding even if the district court was correct that the extrajudicial statements were not admissible under the excited utterance exception, it abused its discretion in excluding them because they were admissible under the residual exception).

Our independent review of the record persuades us that F.T.'s statements contain sufficient circumstantial guarantees of trustworthiness to conclude that they were admissible under the residual exception. First, F.T. volunteered her statement to the nurse without suggesting or leading questions. Second, F.T.'s identification of Robinson as the person who caused her injury is reliable because it remained consistent throughout both of F.T.'s versions of what happened. Only the mechanism of injury changed. Third, F.T. had no motive to lie to the nurse. Her stated reason for lying—to get Robinson in trouble—is questionable because she did not call the police; the hospital did. And there is no evidence that F.T. knew that identifying her abuser to a nurse would start the chain of events that led to police involvement. Fourth, F.T. repeated consistent versions of her statement to two different nurses within a short period of time. Fifth, there are at least three factors that strongly discredit her recanted version: (1) the uncontradicted medical testimony that F.T.'s eye injury could not have been caused by the edge of a door; (2) F.T.'s admission at trial that she has reconciled with Robinson and that she needs him to help raise their two children (i.e., she had a motive to falsely recant); and (3) an inconsistency in F.T.'s recanted version.[5] Finally, F.T.'s extrajudicial statement was strongly corroborated by four other items of evidence: (1) F.T.'s trip to obtain information on getting an order for protection

10 days after the alleged assault; (2) F.T.'s agreement to sign the medical release form for purposes of a police investigation; (3) the neuroradiologist's testimony supporting F.T.'s first version of how her eye was injured; and (4) F.T.'s consistent statement to police 10 days after the incident.

Because F.T.'s statements were admissible under the residual exception, the district court's error in adopting a categorical rule of admissibility for statements of identification by domestic abuse victims under the medical diagnosis exception was harmless.

Affirmed.

ANDERSON, RUSSELL A., Chief Justice (concurring).

I concur in the result but write separately because I would hold that F.T.'s statements identifying Robinson as the person who caused her injury were admissible under the medical diagnosis and treatment exception to the hearsay rule, Minn. R. Evid. 803(4). Because I believe these statements were admissible under Rule 803(4), I would not reach the issue of their admissibility under Minn. R. Evid. 803(24) or Minn. R. Evid. 801(d)(1)(C).

As a preliminary matter, I disagree with the majority's conclusion that de novo review is appropriate. Typically, we review district court rulings admitting hearsay statements for abuse of discretion. *See State v. Henderson,* 620 N.W.2d 688, 696 (Minn.2001). In this case, however, the majority asserts that our review should be de novo because the district court "adopted a categorical rule of admissibility under the medical diagnosis exception" instead of applying the elements of Rule 803(4).

---

**5.** F.T. indicated in her recanted version that she "pulled" the door shut from inside the bathroom. But the state's investigation revealed that the door opens into the bathroom.

I do not agree with the majority's characterization of the district court's ruling. Rather than adopting a categorical rule of admissibility, the district court stated that its ruling admitting F.T.'s statements was intended to be "very narrow." Prior to ruling, the district court heard extensive argument on the admissibility of the statements, during which the court focused on the critical issue under Rule 803(4)— whether the identity of F.T.'s abuser was pertinent to her medical diagnosis or treatment. That the district court specifically asked the parties to pinpoint the aspects of F.T.'s treatment affected by the nurses' knowledge of the identity of her abuser reveals that the court focused on the proper criteria under Rule 803(4) and the rule's application to the case at bar. Because the district court exercised its discretion in deciding that identity was reasonably pertinent to diagnosis or treatment in this case, the court's ruling should "not be overturned on appeal absent a clear abuse of discretion." *State v. Martin,* 695 N.W.2d 578, 583 (Minn.2005). Applying this standard of review, I conclude that the district court did not abuse its discretion in admitting F.T.'s statements under Rule 803(4).

Minnesota Rule of Evidence 803(4) admits as an exception to the hearsay rule:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

F.T. made the disputed statements to a nurse for the purpose of obtaining medical treatment, and the statements described the inception of her injury. Thus, the key question under the rule is whether F.T.'s statements were "reasonably pertinent to diagnosis or treatment."

We have held that in a child sexual abuse case a victim's statements identifying her abuser are admissible under Rule 803(4) because identity is pertinent to medical treatment in such cases. *State v. Larson,* 453 N.W.2d 42, 47 (Minn.1990), *vacated on other grounds,* 498 U.S. 801, 111 S.Ct. 29, 112 L.Ed.2d 7 (1990). In *Larson,* we adopted the Eighth Circuit's reasoning that the nature and extent of the psychological effects of child sexual abuse and their proper treatment often depend on the identity of the abuser.[1] *Id.* (citing *United States v. DeNoyer,* 811 F.2d 436, 438 (8th Cir.1987)); *see also United States v. Renville,* 779 F.2d 430, 436 (8th Cir. 1985) ("Statements by a child abuse victim to a physician during an examination that the abuser is a member of the victim's immediate household *are* reasonably pertinent to treatment."). Similarly, in *State v. Richards,* we considered the admissibility of a victim's statements to a counselor that the victim's half brother beat her and that she was afraid of him. 552 N.W.2d 197, 201, 209 (Minn.1996). We upheld the district court's ruling that the statements were admissible under Rule 803(4). *Richards,* 552 N.W.2d at 209.

Courts in other jurisdictions have ruled along the lines of *Larson* and *Richards,* recognizing that statements identifying an abuser as a family or household member are reasonably pertinent to medical diag-

---

1. The majority claims that we are not sufficiently familiar with the medical issues surrounding treatment of victims of domestic abuse to decide whether the abuser's identity is reasonably pertinent to treatment. However, we do not appear to be any less informed than we were in *Larson,* where we concluded that an abuser's identity is relevant to treatment of a child sexual abuse victim without reference to medical publications or expert medical testimony on that point. *See Larson,* 453 N.W.2d at 47.

nosis and treatment. In a rape case, the Tenth Circuit held that the adult victim's statements to a physician identifying her husband as the perpetrator were admissible under the medical diagnosis and treatment hearsay exception. *United States v. Joe*, 8 F.3d 1488, 1495 (10th Cir.1993). The court explained:

> [T]he identity of the abuser is reasonably pertinent to treatment in virtually every domestic sexual assault case, even those not involving children. All victims of domestic sexual abuse suffer emotional and psychological injuries, the exact nature and extent of which depend on the identity of the abuser. The physician generally must know who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household.

*Id.* at 1494–95 (footnote omitted). The court concluded that a "domestic sexual abuser's identity is admissible under Rule 803(4) where the abuser has such an intimate relationship with the victim that the abuser's identity becomes 'reasonably pertinent' to the victim's proper treatment." *Id.* at 1495.

The Wyoming Supreme Court has extended the reasoning of *Joe* to cases involving domestic physical abuse with no sexual component. *Oldman v. State*, 998 P.2d 957, 962 (Wyo.2000). The court in *Oldman* observed that "[t]here is no logical reason for not applying [the] rationale [of *Joe*] to non-sexual, traumatic abuse within a family or household, since sexual abuse is simply a particular kind of physical abuse." [2] *Id.* The court thus concluded that the victim's statements to a physician were "consistent with the purpose of promoting diagnosis and treatment" and that the assailant's identity was relevant to treatment of the victim. Id. The Washington Court of Appeals, too, has held that statements identifying a family or household member as the perpetrator of a nonsexual physical assault are reasonably pertinent to treatment. *State v. Price*, 126 Wash.App. 617, 109 P.3d 27, 39 (2005) ("A physician's treatment will necessarily differ when the abuser is a member of the victim's family or household * * *.").

I agree with the reasoning of *Oldman* and *Price* and see no principled way to distinguish the domestic physical abuse in this case from the sexual abuse in *Larson* and the physical abuse in *Richards*. As with child sexual abuse, domestic physical abuse entails more than physical injury; it frequently precipitates psychological and emotional problems requiring specific treatment. *See* Am. Med. Ass'n, *Diagnostic and Treatment Guidelines on Domestic Violence* 10 (March 1992), http://www.ama-assn.org/ama1/pub/upload/mm/386/domesticviolence.pdf [hereinafter AMA Guidelines]. [3] In addition, given the often recur-

2. This statement raises an interesting point. As the statement suggests, both sexual abuse and nonsexual physical abuse are prevalent in abusive relationships. Am. Med. Ass'n, *Diagnostic and Treatment Guidelines on Domestic Violence* 7, 9–10 (March 1992), http://www.ama-assn.org/ama1/pub/upload/mm/386/domesticviolence.pdf. It defies logic to permit admission of a victim's statement to a treating physician that "my husband raped me," but not her subsequent statement "and then my husband hit me."

3. I disagree with the majority's conclusion that we cannot rely on the AMA Guidelines in this case because it was not included in the record below. We are free to refer to publicly available documents generally relevant to resolution of an issue before us, even if those documents are not included in the record. *See State v. Rewitzer*, 617 N.W.2d 407, 411 (Minn.2000); *In re Estate of Turner*, 391 N.W.2d 767, 771 (Minn.1986). My use of the AMA Guidelines is not evidentiary in nature. Instead, I employ generic information found in the guidelines to support general proposi-

rent nature of domestic abuse, proper treatment may include efforts to prevent future abuse, which requires knowledge of the identity of the abuser. *See* AMA Guidelines at 7, 12; *see also Nash v. State,* 754 N.E.2d 1021, 1025 (Ind.Ct.App.2001) (noting that part of a nurse's job in assessing and treating patients is to recommend domestic violence resources when appropriate); *Oldman,* 998 P.2d at 962 (noting that knowledge of the abuser's identity was important to preventing further abuse). Thus, the fact that an abuser is a member of the victim's family or household is reasonably pertinent to diagnosis and treatment of the underlying domestic abuse and its attendant psychological and emotional injuries.

In this case, the assessment and treatment form used by J.W. to evaluate F.T. provides further evidence of the relevance of the identity of F.T.'s abuser to her diagnosis and treatment. Included on the form is a section entitled "abuse assessment," which inquires whether the patient has been "hurt or mistreated by someone important to [her]." The section also provides a space for nurses to indicate whether "referral information" was given to the patient. Inclusion of this section reveals that Abbott Northwestern Hospital considers the identity of a patient's abuser to be relevant to assessment and treatment in the context of domestic abuse. Because F.T.'s statements were reasonably pertinent to her diagnosis and treatment, I would hold that the district court did not abuse its discretion by admitting the statements under Rule 803(4).

MEYER, Justice (concurring).

I join in the concurrence of Chief Justice Russell A. Anderson.

tions about the symptoms and treatment of domestic abuse. Such usage is distinguishable from the statistical information stricken in *Hinneberg v. Big Stone County Hous. &*

PAGE, Justice (concurring).

I concur in the result.

*Redevelopment Auth.,* 706 N.W.2d 220, 224 (Minn.2005), which was specific to the parties and issues involved in that case.